Francis J. WALDO, Plaintiff,

v.

NORTH AMERICAN VAN LINES, INC., Defendant.

Civ. A. No. 82–2668.

United States District Court, W.D. Pennsylvania.

Sept. 4, 1987.

John T. Tierney III, Tarasi & Tighe P.C., Pittsburgh, Pa., John W. Pollins, III, Greensburg, Pa., for plaintiff.

David J. Armstrong, Dickie, McCamey & Chilcote, Pittsburgh, Pa., for defendant.

## OPINION

COHILL, Chief Judge.

Presently before us is defendant's motion for summary judgment on all five counts of plaintiff's second amended complaint. Plaintiff, Francis J. Waldo, a former truck driver, brought this action against North American Van Lines, Inc. ("NAVL") for alleged violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201–1 et seq.; Section 1 of the Sherman Act, 15 U.S.C. § 1; Section 3 of the Clayton Act, 15 U.S.C. § 14; Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45; the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. §§ 1961—1968; and common law fraud.

The underlying facts were extensively described in our earlier Opinion and Order denying plaintiff's motion for class certification. *Waldo v. North American Van Lines, Inc.*, 102 F.R.D. 807, 809–10 (W.D. Pa.1984) ("*Waldo I*"). Briefly restated, the instant dispute arose from plaintiff's having entered into a business relationship with NAVL to become one of its truck

drivers ("owner/operators"), which proved to be unprofitable. Plaintiff contends that NAVL made several misrepresentations to him and failed to disclose material facts which enticed him into joining NAVL's fleet of owner/operators. In essence, plaintiff alleges that NAVL over-recruited and under-utilized its drivers, which ultimately forced plaintiff to terminate his Operating Agreement. Additionally, plaintiff avers that NAVL violated federal antitrust laws by its practice of (1) tying the sale of insurance to its sale of trucks, as well as other tying claims, and (2) prohibiting its drivers from carrying loads for competitors when they are not doing so for defendant (i.e., "trip leasing").

*Summary Judgment*

When considering a motion for summary judgment, the Court must determine whether the pleadings, depositions, affidavits, answers to interrogatories, and admissions on file, when viewed in the light most favorable to the non-moving party, present a genuine issue as to any material fact. If not, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The materiality of a disputed fact is determined by looking to the substantive law of the case. Disputes over facts which will not affect the outcome of the case do not preclude summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, ——, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202, 211 (1986). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at ——, 106 S.Ct. at 2511, 91 L.Ed.2d at 213.

The moving party bears the burden of proving that no genuine issue exists. *Adickes v. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). However, this burden can be discharged by merely pointing out the "absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, ——, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265, 275 (1986). Once the moving party has met that burden, it becomes incumbent upon the non-moving party "to make a showing suffi-

cient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." 477 U.S. at ——, 106 S.Ct. at 2553, 91 L.Ed.2d at 273. Any doubts must be resolved in favor of the non-moving party. *Gans v. Mundy,* 762 F.2d 338, 341 (3d Cir.1985).

*Discussion*

I. *Pennsylvania Unfair Trade Practices and Consumer Protection Law*

Count One of plaintiff's amended complaint sets forth several alleged violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("CPL"), 73 P.S. § 201–1 *et seq.* which stem from plaintiff's purchase and lease back of a GMC tractor from defendant, coupled with the purchase of appropriate types of insurance from defendant. The gist of plaintiff's allegations is that the goods purchased did not conform to certain deceptive representations made by NAVL, and that the conduct of NAVL caused plaintiff to be confused and/or to misunderstand the nature of the transaction.

In support of its motion for summary judgment, defendant contends that a private action brought under the CPL is limited to "consumers of goods and services." *Layton v. Liberty Mutual Fire Insurance Co.,* 530 F.Supp. 285, 286 (E.D.Pa.1981). Because plaintiff purchased the truck and insurance as part of a business venture, NAVL contends that he cannot bring an action under the CPL.

Pennsylvania courts have construed the remedial provisions of the CPL liberally. *See, e.g., Commonwealth v. Monumental Properties,* 459 Pa. 450, 457–60, 329 A.2d 812, 815–17 (1974); *Pekular v. Eich,* 355 Pa.Super. 276, 286–87, 513 A.2d 427, 432 (1986). However, § 201.9.2(a) of the CPL provides that a private action may only be brought by "[a]ny person who purchases or leases goods or services primarily for personal, family or household purposes...." The obvious intent of this language is to restrict claims brought under the CPL to those which are legitimately of a consumer nature. Here, plaintiff bought the tractor and the insurance coverage solely for use

in his trucking business and, as such, they cannot qualify as consumer goods (i.e., food, clothes, household items and the like). The fact that plaintiff entered into a purchase *and* lease back arrangement with NAVL unequivocally establishes that he purchased the goods for a commercial purpose; he did not buy them to consume personally or with his family, but instead, purchased them to operate a business partnership with NAVL.

While our research has uncovered no Pennsylvania case squarely on point, we note that several cases from the Eastern District of Pennsylvania have limited the application of the CPL to consumer transactions. *See Merv Swing Agency, Inc. v. Graham Co.*, 579 F.Supp. 429 (E.D.Pa. 1983); *Zerpol Corp. v. DMP Corp.*, 561 F.Supp. 404 (E.D.Pa.1983); *Klitzner Industries, Inc. v. H.K. James & Co.*, 535 F.Supp. 1249 (E.D.Pa.1982); *Permagrain Products, Inc. v. U.S. Mat & Rubber Co.*, 489 F.Supp. 108 (E.D.Pa.1980). Plaintiff contends that these cases are inapposite, as they involved claims brought under the CPL by plaintiff-business entities which possessed equal bargaining power with the defendant-business entities and/or were direct competitors in the marketplace. We disagree with plaintiff's argument. Irrespective of any unequal bargaining power between the parties, plaintiff's sole motivation for purchasing the tractor and insurance from NAVL was to operate a business; this is not primarily a "personal, family or household purpose." We do not believe that the legislature intended the CPL to reach garden variety breach of contract or alleged fraud situations such as the one asserted here; neither of these parties is a "consumer" as that term is commonly understood. Thus, we will grant defendant's motion for summary judgment on Count One of plaintiff's amended complaint.

## II. *Federal Trade Commission Act Claim*

While our earlier opinion in *Waldo I* dealt solely with the issue of class certification, we intimated then, *see* 102 F.R.D. at 811, and reiterate now, that section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, does not provide for a private right of action. *See, e.g., Holloway v. Bristol-Meyers Corp.*, 485 F.2d 986 (D.C.Cir.1973) (private parties have no right of action to enforce provisions of FTC Act, which vests enforcement authority in administrative agency), *Carlson v. Coca-Cola Co.*, 483 F.2d 279 (9th Cir.1973); *Kaiser v. Dialist Company of Texas*, 603 F.Supp. 110, 111 (W.D.Pa.1984). "A fair reading of the statute and its legislative history evinces a plain intent by Congress to make the administrative program for enforcing the Federal Trade Commission Act an exclusive one." *Holloway*, 485 F.2d at 1002. Moreover, the language of the FTC Act specifically provides an exception for "common carriers subject to the Acts to regulate commerce." 15 U.S.C. § 45(a)(2) (Supp. 1987). Consequently, defendant's motion for summary judgment relating to plaintiff's failure to state a claim under the FTC Act will be granted.

## III. *Antitrust Claims*

Plaintiff has also alleged that NAVL violated the federal antitrust laws in several respects. While the standard for summary judgment does not differ from other cases in the antitrust context, the Supreme Court has cautioned that courts should tread carefully where motive and intent are important issues. *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) ("summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot.") However, as in other cases, summary judgment will be granted in the "absence of any significant probative evidence tending to support the complaint." *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968). *See also Arnold Pontiac-GMC v. General Motors Corp.*, 786 F.2d 564, 572 (3d Cir.1986). As we noted earlier, our inquiry is limited to determining whether a genuine issue of

material fact exists in the present record. *Celotex, supra.*

## A. *Tying Arrangements*

### 1. *Insurance Tied to Tractor*

█ In connection with plaintiff's consumer fraud claim at Count One, plaintiff alleges that NAVL illegally tied the purchase of insurance to the purchase of plaintiff's GMC tractor. In *Waldo I,* we noted that three elements must be proven in all private antitrust claims: "1) a violation of the antitrust laws; 2) direct injury to the plaintiff caused by the violation (often referred to as fact of damage); and 3) damages." 102 F.R.D. at 812. "While tying and exclusive dealing agreements are prohibited by both section 1 of the Sherman Act and section 3 of the Clayton Act, the scope of section 3 is limited to commodities." *Id.* The term commodity as used in this section denotes some type of tangible property that may be leased or sold. *Satellite Television & Associated Resources, Inc. v. Continental Cablevision of Virginia, Inc.,* 586 F.Supp. 973 (1982), *aff'd,* 714 F.2d 351 (4th Cir.1983), *cert. denied,* 465 U.S. 1027 (1984). *Both* the tying and tied item must be "goods, merchandise, machinery, supplies or other commodities" as set forth in 15 U.S.C. § 14. *See, e.g., Moore v. Jas. H. Matthews & Co.,* 550 F.2d 1207, 1214 (9th Cir.1977). Therefore, plaintiff's claims cannot arise under section 3 of the Clayton Act since insurance is not a tangible "good" or "commodity" as those terms are commonly defined.

> Three elements are necessary to establish a *per se* illegal tie-in violation under the Sherman Act: 1) the seller must offer two distinct and separate products together, the tie being established by an agreement conditioning the sale of the tied product to separate purchase of the tying product; 2) a "not insubstantial" amount of commerce must be involved; and 3) the seller must have sufficient market power with respect to the tying product to appreciably restrain free competition in the market for the tied product.... (citations omitted).

The general definition of a tying arrangement has remained unchanged for many years. It is "an agreement by a party to sell one product but only on the condition that the buyer also purchase a different (or tied) product, or at least agrees that he will not purchase that product from another supplier." *Northern Pac. Ry. v. United States,* 356 U.S. 1, 5–6, 78 S.Ct. 514, 518–519, 2 L.Ed.2d 545 (1958). "[W]here the buyer is free to take either product by itself there is no tying problem even though the seller may also offer the two items as a unit at a single price." *Jefferson Parish Hospital Dist. No. 2 v. Hyde,* 466 U.S. 2, 12 n. 17, 104 S.Ct. 1551, 1558 n. 17, 80 L.Ed.2d 2, 12 n. 17 (1984). *See also Levicoff v. General Motors Corp.,* 551 F.Supp. 98, 102 (W.D.Pa.1982), *aff'd,* 722 F.2d 732 (3d Cir.1983). The Supreme Court in *Jefferson Parish, supra,* emphasized that the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. 466 U.S. at 11–12, 104 S.Ct. at 1558, 80 L.Ed.2d at 12.

*Waldo I,* 102 F.R.D. at 812–13.

█ Proof of a tying arrangement can be established either by reference to an express contractual provision or by showing that the plaintiff was coerced into accepting the tied item. *SmithKline Corp. v. Eli Lilly & Co.,* 427 F.Supp. 1089, 1112 (E.D.Pa.1976), *aff'd,* 575 F.2d 1056 (3d Cir. 1978), *cert. denied,* 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978). Here, there is nothing in the Truckman's Agreement or the Contractor Operating Agreement which directly or indirectly requires owner/operators to purchase insurance specifically and solely through NAVL. As we noted in our earlier Opinion denying class certification, "[t]he contracts state that the operator must obtain insurance, and unless the operator secures insurance elsewhere and provides proof to the company of purchase, that the insurance would be provided by the Company. *See* Truckman's Agree-

ment, ¶ 16, Contractor Operating Agreement, ¶ 16." *Id.* at 813. Thus, the agreements, standing alone, do not establish an illegal tying arrangement.

In *Ungar v. Dunkin' Donuts of America, Inc.*, 531 F.2d 1211, 1224 (3d Cir.1976), *cert. denied*, 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976), Judge Aldisert set forth the elements of proof necessary to establish an illegal tying arrangement in the absence of a formal agreement or contract provision doing so:

> ... a plaintiff must establish in some other way that a tie-in was involved and not merely the sale of two products by a single seller. This can be done by proof that purchase of one product, the tied product, was not voluntary, i.e. by proof of coercion. ... proof of a tie-in must focus on the buyer, because a voluntary purchase of two products is simply not a tie-in. 531 F.2d at 1224.

Judge Aldisert went on to set forth the evidence needed to establish coercion:

> We understand the argument that proof of acceptance of a burdensome or uneconomic offer of a secondary ("tied") product is some evidence of coercion. We cannot, however, accept the proposition that such proof, alone, would suffice to establish, prima facie, the coercion element of an illegal tie-in claim. Establishing that buyers purchase products A and B from the seller does not establish that the seller ties the sale of product A to the purchase of product B. It merely establishes that buyers purchase products A and B from the seller.

*Id.* at 1225.

NAVL contends that applying these principles to the instant dispute mandates a finding that it did not tie the sale of insurance to the sale of tractors. In response to plaintiff's claims of coercion, NAVL explains that it merely provided a convenient alternative for plaintiff, who freely chose to purchase insurance from NAVL rather than from another source.

In support of its position, defendant refers to plaintiff's deposition testimony where he stated that he purchased various types of insurance from NAVL, including bobtail, trailer and tractor coverage. Plaintiff's Deposition at 92. Plaintiff further testified that such insurance was mandatory. *Id.* at 92, 98. Plaintiff testified that he subsequently checked around and discovered that International Harvester offered a cheaper rate on the tractor and bobtail insurance. *Id.* at 93. When asked by defense counsel why he did not switch coverage, plaintiff stated:

Q. Why didn't you do it?

A: I didn't have no money. North American had all my money.

Q: Any other reason why you wouldn't switch to the cheaper insurance?

A: I didn't have—

Q: Was ... there any other reason?

A: No. If I would have had—well, not. If I would have had the money, I would have, but I didn't have it at the time.

Q: So did anything further come of that?

A: No.

Q: Did you ever investigate any other insurance?

A: I did on one. It was a local. It was higher than what—not higher, but about the same bracket that I was paying.

*Id.* at 96.

The following testimony, like that above, reveals that plaintiff was thoroughly aware of his ability to purchase insurance from a source other than NAVL:

Q: Did they tell you again back when you were at Fort Wayne being initially processed, did they tell you you could go one of two ways on the tractor insurance; you could either participate in a plan run by North American or you could go outside and buy insurance?

MR. TIERNEY: Just refer to what you recall in 1978.

A: Well, as far as I can remember, that's what I was told.

*Id.* at 101. At a later point in his deposition testimony, plaintiff reiterated that insurance was required and could be purchased from NAVL or a private company. *Id.* at 150.

■ Our review of this evidence convinces us that plaintiff has failed to produce proof of coercion. Plaintiff consistently

has stated that the reason he purchased insurance from NAVL was because he could not afford to purchase it from another source; yet, in plaintiff's deposition, he admits that comparably priced insurance was available from another source. *Id.* at 96. By admitting that he was aware of his option to purchase insurance elsewhere, plaintiff has defeated the very essence of his illegal tying claim. "It is only when the buyer's freedom to choose a given product is restricted that the tying doctrine comes into play: so long as 'the buyer is free to take either product by itself there is no tying problem.' " *Ungar*, 531 F.2d at 1226, *quoting Northern Pacific Ry. v. United States*, 356 U.S. 1, 5–6, 78 S.Ct. 514, 518–19, 2 L.Ed.2d 545 (1958). Here, plaintiff was free to buy insurance from a private source; the fact that he alleges that he lacked the funds to do so does not constitute coercion by NAVL. Plaintiff has presented no evidence which establishes that he was coerced into buying insurance from NAVL. Nor do we find that NAVL's arrangement of offering insurance to its drivers was inherently coercive. As we noted in *Waldo I:*

> the presence of superior bargaining position and economic leverage of the supplier over dealers is the rule rather than the exception. Such factors in themselves cannot constitute sufficient proof of coercion ...

102 F.R.D. at 815 (citation omitted).

It was mandatory that plaintiff have insurance in order to become an NAVL owner/operator; insurance was a legal prerequisite to driving. This is similar to a bank or lending institution requiring a mortgage applicant to purchase insurance to protect the bank's loan. Neither do we not find it inherently coercive that plaintiff had already given NAVL the down payment on the tractor and therefore had no available funds to purchase insurance elsewhere. On the contrary, were it not for NAVL's arrangement to provide insurance and to deduct the premiums from plaintiff's paychecks, he would not have been able to secure insurance at all. Thus, the alleged "tying arrangement" was, in reality, merely an economic convenience to plaintiff.

*Cf. Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984) (tying of hospital and anesthesiologist services reduced patients' costs and improved quality of health care).

After carefully considering plaintiff's state of mind, as illustrated by his uncontradicted deposition testimony, we must reject this tying claim. While coercion may involve inquiries into credibility, motive, and intent, *see Ungar*, 531 F.2d at 1226, even the most favorable inference reasonably to be drawn from this evidence cannot convince us that plaintiff's "tying" allegations establish any genuine issue for trial. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (non-moving party must do more than simply show that there is some metaphysical doubt as to the material facts).

### 2. *Other Tying Claims*

■ While not set forth in his amended complaint, plaintiff has additionally raised a rather vague reference to a tying arrangement between the security agreement and the operating agreement. Specifically, he states in his brief:

> NAVL effected its tying arrangements by requiring the purchaser of its tractors to enter into a Contractor's Operating Agreement. The operating agreement precluded the purchaser's hauling loads for any carrier except NAVL. The operating agreement was tied into the purchase of the truck by the Security Agreement used in connection with financing the truck. The Security Agreement provided that default as to the terms of the operating agreement constituted default as to the security agreement. By the terms of these agreements, then, if an owner/operator purchaser drove his tractor for any other carrier than NAVL, NAVL could repossess that purchaser's tractor.

Plaintiff's Brief In Opposition to Defendant's Motion for Summary Judgment at 34.

Again, we note that section 3 of the Clayton Act is inapplicable because neither

agreement constitutes "goods, merchandise, supplies or other commodities." 15 U.S.C. § 14; *Satellite Television, supra,* 714 F.2d at 358. However, even under section 1 of the Sherman Act, this allegation fails to state a viable claim. As the Supreme Court stated in *Jefferson Parish Hospital:*

In sum, any inquiry into the validity of a tying arrangement must focus on the market or markets in which the two products are sold, for that is where the anticompetitive forcing has its impact. Thus, in this case our analysis of the tying issue must focus on the hospital's sale of services to its patients, rather than its contractual arrangements with the providers of anesthesiological services. In making that analysis, we must consider whether petitioners are selling two separate products that may be tied together, and, if so, whether they have used their market power to force their patients to accept the tying arrangement.

466 U.S. at 16–17, 104 S.Ct. at 1560–61.

We do not deem it necessary here to embark upon an in-depth analysis of the relevant product and geographic markets, *see Pontius v. Children's Hospital,* 552 F.Supp. 1352, 1365–66, (W.D.Pa.1982), because plaintiff has failed to allege the tying of two products and/or services within the meaning of the Sherman Act. Here, the Security Agreement was no more than a note requiring plaintiff to repay the money borrowed from NAVL, and the Operating Agreement was merely a contractual arrangement governing plaintiff's employment. Therefore, neither agreement, by itself, can be viewed as a product or service which plaintiff purchased from defendant. Alternatively, even if two distinct products and/or services existed, there is no evidence that NAVL forced plaintiff into accepting the tied item.

In *Satellite Television v. Continental Cablevision, supra,* the plaintiff brought an antitrust action against the defendant cable television company challenging defendant's exclusive dealing contract which gave apartment owners desiring a cable hookup the option of either paying for the wiring of their building or giving defendant exclusive pay television rights to the buildings. Plaintiff attempted to equate the exclusivity provision to a *per se* illegal tie between the transmission equipment installed in the apartment buildings and the cable television programming. The Court of Appeals for the Fourth Circuit rejected this argument and concluded "that the programming and the transmission equipment are one product." 714 F.2d at 354. In explaining its conclusion, the *Satellite Television* court stated "that the transmission equipment is incidental to the provision of the service, which is the dominant factor in the transaction." *Id.* (citation omitted).

In the factually analogous case of *Hand v. Central Transport, Inc.,* 779 F.2d 8 (6th Cir.1985), an owner/operator alleged that the trucking company illegally tied the financing of trucks with the acceptance of its offer of employment. Reversing the district court's granting of summary judgment for the company, the *Hand* court concluded that there was an issue for trial as to what constituted the relevant truck credit market. We find *Hand* to be inapplicable here since 1) plaintiff has never alleged that financing was the tying product; 2) plaintiff has never indicated that he wanted to secure financing elsewhere; and 3) plaintiff has failed to allege as tie between two distinct products which a "consumer might wish to purchase separately." *Jefferson Parish, supra,* 466 U.S. at 30, 104 S.Ct. at 1567–68. *See Levicoff v. General Motors Corp.,* 551 F.Supp. 98, 101–02 (W.D.Pa.1982) (court held no tying arrangement existed between 12.8% financing for certain automobiles and purchase of those automobiles).

■ Nevertheless, in a tortured comparison to *Jefferson Parish,* plaintiff adds a new twist to his litany of "tying" claims by contending that his exclusive services were tied to the purchase of the tractor trucks. Plaintiff's Brief at 35–41. However, in *Jefferson Parish,* both services were ultimately consumed by the patient, whereas, here, the services of plaintiff were leased by NAVL and the tractor was purchased by plaintiff. In an economic sense, then, the

product and the services were moving in different directions. It is a fundamental principle of antitrust law that an illegal tying arrangement requires that at least two products and/or services be purchased by the same individual; that is, there must be lineal movement between the products. *Jefferson Parish, supra; Northern Pacific Ry. v. United States*, 356 U.S. at 5–6, 78 S.Ct. at 518–19. *Cf. 49er Chevrolet, Inc. v. General Motors Corp.*, 803 F.2d 1463, 1469 (9th Cir.1986) ("where [car] dealers perform repair services for GM and are paid by GM, they are not buyers of an allegedly tied product at all, but are sellers.") Because plaintiff has failed to establish the requisite tie between two distinct products and/or services, we will dismiss this claim as a matter of law.

As illustrated by the above discussion, plaintiff has vacillated as to what products and/or services were actually tied together. We noted previously that "[s]imply characterizing an exclusive dealing arrangement as a tying arrangement does not necessarily make it one." *Waldo I*, 102 F.R.D. at 816. However, the common thread that runs through all of plaintiff's tying claims is the exclusive dealing restriction on his employment. Thus, our inquiry now turns to that issue.

## B. *Exclusive Dealing*

Plaintiff alleges that both the 1978 Truckman's Agreement and the superseding 1979 Contractor Operating Agreement impose exclusive dealing arrangements on drivers. "The Truckman's Agreement limited operation exclusively to service for North American. The Contractor Operating Agreement set forth the same condition, but provided for trip-leasing with the permission of the Company." *Waldo I*, 102 F.R.D. at 817–18; Plaintiff's Amended Complaint, ¶ 13. Plaintiff contends that NAVL denied over 20 of his requests to trip lease while allowing him to do so on only one occasion.

█ Unlike tying arrangements and boycotts, which can be subject to a *per se* analysis, exclusive dealing contracts demand a more in-depth economic analysis and can be found to be illegal only on direct proof of their economic impact. *See, e.g., Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961); *Bravman v. Bassett Furniture Industries, Inc.*, 552 F.2d 90 (3d Cir.), *cert. denied*, 434 U.S. 823, 98 S.Ct. 69, 54 L.Ed.2d 80 (1977). The ultimate inquiry must focus on whether the exclusivity provision substantially lessens competition. *Satellite Television*, 714 F.2d at 355.

The mere existence of an exclusive dealing clause does not violate the antitrust laws. *See Bob Maxfield, Inc. v. American Motors Corp.*, 637 F.2d 1033, 1036 (5th Cir.), *cert. denied*, 454 U.S. 8620, 102 S.Ct. 315, 70 L.Ed.2d 158 (1981). In fact, the Supreme Court has observed that exclusive dealing arrangements often promote competition. *See Standard Oil Co. v. United States*, 337 U.S. 293, 306, 69 S.Ct. 1051, 1058, 93 L.Ed. 1371 (1949). The evil attendant in such arrangements is that they may, in some circumstances, 'create or extend market power of a supplier or the purchaser party to the exclusive dealing arrangement, and may thus restrain horizontal competition. Exclusive dealing can have adverse economic consequences by allowing one supplier of goods or services unreasonably to deprive other suppliers of a market for their goods, or by allowing one buyer of goods unreasonably to deprive other buyers of a needed source of supply. In determining whether an exclusive dealing contract is unreasonable, the proper focus is on the structure of the market for the products or services in question— the number of sellers and buyers in the market, the volume of their business, and the ease with which buyers and sellers can redirect their purchases or sales to others. Exclusive dealing is an unreasonable restraint on trade only when a significant fraction of buyers or sellers are frozen out of a market by the exclusive deal. When the sellers of services are numerous and mobile, and the number of buyers is large, exclusive dealing arrangements of narrow scope pose no threat of adverse economic consequences. To the contrary, they may be

substantially procompetitive by ensuring stable markets and encouraging long term, mutually advantageous business relationships.' *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 45, 46, 104 S.Ct. 1551, 1575–1576, 80 L.Ed.2d 2, 33–34 (O'Connor, J., concurring). These arrangements are analyzed under the Rule of Reason. *Id.*

*Waldo I*, 102 F.R.D. at 817.

In support of its motion for summary judgment, NAVL contends that the exclusivity provisions of its contracts were mandated by various regulations promulgated by the Interstate Commerce Commission (ICC). NAVL contends that these regulations eliminated plaintiff's right to trip lease independently since he was operating under a contract/lease with an authorized carrier. As such, NAVL contends that its exclusive dealing arrangements are immune from antitrust scrutiny.

■ The term "trip lease" is defined as "[a] lease in which an authorized carrier acquires the use of equipment, with or without driver from an owner for a period of time less than 30 days." 49 C.F.R. § 1057.2(g). At the time plaintiff operated his tractor pursuant to the lease with NAVL, 49 C.F.R. § 1057.12(c) required that said lease be for a period of at least thirty days.[1] More importantly, §§ 1057.12(d)(1), (2) provided as follows:

(d) *Exclusive possession and responsibilities*

(1) The lease shall provide that the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease. The lease shall further provide that the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease.

(2) Provision may be made in the lease for considering the authorized carrier lessee as the owner of the equipment for the purpose of subleasing it under these regulations to other authorized carriers during the lease.

As the above language indicates, the authorized carrier has the option of trip-leasing, but not the owner/operator, who must relinquish all possession, control and use of the tractor during the lease period. *See Central Forwarding Inc. v. ICC*, 698 F.2d 1266, 1267 (5th Cir.1983). Thus, NAVL had to comply with these regulations as a condition of doing business in the trucking industry, which was highly regulated during the events at issue.

The Supreme Court upheld these regulations in *American Trucking Associations, Inc., v. United States*, 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337 (1953). There, the Court condemned the practice of trip-leasing, especially for single trips, noting that it hindered the regulatory scheme of the Interstate Commerce Act and violated the ICC's safety requirements. *Id.* at 304–05, 73 S.Ct. at 311–12. Other concerns of the ICC included "the economic stability of the industry" and the obstruction of normal rate regulation. *Id.* at 305–06, 73 S.Ct. at 312–13.

Obviously, these regulations sought to encourage owner/operators to "ally themselves with the regulated industry" rather than escaping regulation by trip-leasing to private carriers. *Ryder Truck Lines, Inc. v. United States*, 716 F.2d 1369, 1376 n. 10 (11th Cir.1983). It follows, therefore, that the exclusivity provisions in NAVL's operating agreement were mandated by the regulatory scheme of the ICC. Consequently, "the antitrust laws must give way if the regulatory scheme established by the [ICC] is to work." *United States v. National Association of Securities Dealers*, 422 U.S. 694, 729–30, 95 S.Ct. 2427, 2448, 45 L.Ed.2d 486 (1975). *See Silver v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1961). Thus, we find the exclusive dealing provisions to be immune from antitrust scrutiny.

As we noted above, plaintiff became subject to regulation by the ICC the moment he entered into the Contractor Operating Agreement with NAVL. In *Global Van*

---

1. 49 C.F.R. § 1057 was modified in 1984 to eliminate the thirty-day leasing requirement. In any event, at the time plaintiff operated for NAVL, the requirement existed.

*Lines, Inc., v. I.C.C.,* 627 F.2d 546, 550 (D.D.C.1980), the court noted that "carriers of agricultural products, which are otherwise exempt from the operation of the Act, should also be exempt from regulations governing leasing arrangements. 49 U.S.C. § 11101(c)." Here, however, plaintiff had already entered into an agreement with NAVL; thus, he was not "otherwise exempt" from ICC's regulation. Furthermore, our review of the record discloses no evidence that plaintiff ever sought to haul agricultural or other exempt goods. On the contrary, he entered into an arrangement with NAVL specifically to haul large household goods, products and furniture.

■ Alternatively, even if we found no antitrust immunity, plaintiff's exclusive dealing claim lacks sufficient proof to survive a rule of reason analysis. Due to the ubiquitous nature of the ICC's past regulation of the trucking industry, exclusive dealing was a common method of operation. *See Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,* 597 F.Supp. 217, 222 (D.D.C.1984). Consequently, the only way that plaintiff, who had limited finances, could become an owner/operator was to enter into an agreement to haul goods exclusively for an authorized carrier. Because the ICC prohibited trip-leasing by owner/operators, we are hard pressed to find any substantial anti-competitive effect within the relevant market of authorized carriers (i.e., NAVL, Atlas Van Lines, Allied Van Lines, etc.). Furthermore, plaintiff was provided with the opportunity to haul goods exclusively for one of the major van lines, which, in turn, allowed him to utilize its name, equipment, and goodwill. As we noted earlier, exclusive dealing arrangements "may be substantially procompetitive by ensuring stable markets and encouraging long term, mutually advantageous business relationships." *Jefferson Parish,* 466 U.S. at 34, 104 S.Ct. at 1569–70. (O'Connor, J., concurring). In the present case, the economic reality of plaintiff's predicament was that he became disillusioned with NAVL's operations and failed to earn the amount of money he initially expected. We find that plaintiff has failed to establish the requisite showing of a sub-

stantial anticompetitive effect in the relevant market. *Jefferson Parish, supra; Satellite Television, supra. See Robert's Waikiki U–Drive v. Budget Rent-A-Car,* 732 F.2d 1403, 1408 (9th Cir.1984) ("injury to the antitrust plaintiff alone is not sufficient to prove injury to competition").

Accordingly, we will grant defendant's motion for summary judgment on this claim.

## C. *Boycott*

Plaintiff also contends that "[b]y refusing to permit the Plaintiff to enter into so called "trip lease" agreements with other carriers and at the same time refusing to deal with Plaintiff, Defendant, through its agents, servants and employees, conspired and agreed to boycott the Plaintiff in the operation of his business, such that Plaintiff was denied the opportunity to obtain revenues as a motor vehicle tractor operator...." Second Amended Complaint, ¶ 23. In support of this claim, plaintiff attaches the affidavit of Priscilla J. Petar which specifies that Vicky Reem, plaintiff's dispatcher, engaged in a scheme with agents of NAVL to withhold loads to plaintiff in order to benefit other drivers. Plaintiff's Brief, Exhibit K. The crux of plaintiff's boycott claim is that NAVL conspired with its employees to boycott a percentage of North American drivers equal to its previous year's attrition rate. By basing its Fleet Plan on the previous year's attrition rate, plaintiff contends that NAVL knew at the time it recruited its drivers, that a certain percentage of them could not survive in business based on NAVL's then current business levels.

■ A boycott is defined, as a "concerted refusal by traders to deal with other traders." *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). *See DeFillipo v. Ford Motor Corp.,* 516 F.2d 1313, 1318 (3d Cir.), *cert. denied,* 423 U.S. 912, 96 S.Ct. 216, 46 L.Ed.2d 141 (1975). However, section 1 of the Sherman Act requires concerted action between two or more enterprises. *See, e.g. Copperweld Corp. v. Independence Tube*

*Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) (corporation could not conspire with wholly owned subsidiary); *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984) (Sherman Act distinguishes between concerted and independent action); *Morrison v. Murray Biscuit Co.,* 797 F.2d 1430 (7th Cir.1986) (same). Mere unilateral or independent activity, whatever its motivation, cannot give rise to an antitrust violation. *Fragale & Sons Beverage Co. v. Dill,* 760 F.2d 469, 473 (3d Cir.1985). We conclude that defendant is incapable of conspiring with its employees/agents to boycott or refuse to deal with plaintiff. *Tose v. First Pennsylvania Bank, N.A.,* 648 F.2d 879, 893–94 (3d Cir.), *cert. denied,* 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1984). Despite extensive discovery, plaintiff has presented no evidence which establishes that NAVL and another entity had "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto,* 465 U.S. at 764, 104 S.Ct. at 1471, *quoting Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d 105, 111 (3d Cir.1980). We conclude now, as we did in *Waldo I,* that "plaintiff has identified no other parties to the so-called conspiracy." 102 F.R.D. at 813.

Assuming, *arguendo,* that a conspiracy could have been proven, we note that a district court has rejected a similar boycott claim under both a *per se* and rule of reason analysis. *See Rothery Storage & Van Co. v. Atlas Van Lines,* 597 F.Supp. 217 (D.D.C.1984) (exclusive dealing agreements between agents and van line did not restrain trade).

Accordingly, we will grant defendant's motion for summary judgment on this claim.

## IV. *RICO Claims*

Counts III and IV of plaintiff's amended complaint allege claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961–1968. RICO, which is directed at "racketeering activity" as defined in § 1961(1), encompasses indictable acts under specific federal statutes. Specifically, plaintiff claims that NAVL mailed recruiting literature to potential drivers which contained several misrepresentations and did not disclose, *inter alia,* NAVL's high turnover rate of drivers or that NAVL recruited far more drivers than it could provide loads to. In addition, plaintiff alleges that telephone conversations with one James Fitzgerald, a recruiter for defendant, resulted in his being deceived by the allegedly false representations made by Mr. Fitzgerald. Thus, plaintiff charges that the defendant effectuated fraudulent and deceptive correspondence and communications to plaintiff, in violation of the federal statutes barring mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343.

The substantive RICO statute, as codified at 18 U.S.C. § 1962(c) provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

To state a justiciable claim under § 1962(c), a plaintiff must allege "1) conduct 2) of an enterprise 3) through a pattern 4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985) (footnote omitted). Pursuant to 1964(c) of RICO a person aggrieved by a violation of § 1962 may bring a private action for treble damages.

In support of its motion for summary judgment on plaintiff's RICO claims, NAVL advances four defenses: 1) that NAVL did not engage in mail fraud; 2) that the RICO claim is barred by the applicable statute of limitations; 3) that a RICO enterprise must have an existence apart from the defendant itself; and 4) that plaintiff lacks standing to bring the RICO action because he has failed to allege: (a) that NAVL has been convicted of the alleged predicate acts, (b) that there is any nexus between defendant and organized

crime, or (c) that plaintiff has suffered a distinct racketeering injury.

We believe that NAVL's argument that the alleged enterprise must have a separate existence from the defendant has merit and is sufficient to support the entry of summary judgment against plaintiff on the two RICO counts in the Complaint. We will, however, discuss all of the defendant's arguments and state our reasons for rejecting all but the one just mentioned.

■ At the outset, we note that the contentions raised by defendant in its fourth theory above have been explicitly rejected by the United States Supreme Court in *Sedima*. Regarding the requirement of a prior conviction as a prerequisite to bringing a civil RICO action, the Court in *Sedima* held:

> In sum, we can find no support in the statute's history, its language, or considerations of policy for a requirement that a private treble damages action under § 1964(c) can proceed only against a defendant who has been criminally convicted. To the contrary, every indication is that no such requirement exists.

*Id.* at 493, 105 S.Ct. at 3284. Moreover, the *Sedima* Court, in reversing the Second Circuit Court's requirements of a separate racketeering injury and previous convictions, stated that "Congress wanted [RICO] to reach both 'legitimate' and 'illegitimate' enterprises.... The former enjoy neither an inherent incapacity for criminal activity nor immunity from its consequences." *Id.* at 499, 105 S.Ct. at 3287 (citations omitted). Acknowledging that civil RICO was there being applied to legitimate businesses rather than the archetypal, intimidating mobster, the *Sedima* Court emphasized that "this defect—if defect it is—is inherent in the statute as written, and its correction must lie with Congress." *Id.*

Our Circuit Court has interpreted this language as completely rejecting any requirement of a nexus with organized crime. *See Gilbert v. Prudential-Bache Securities, Inc.,* 769 F.2d 940, 942 (3d Cir.1985). Likewise, this Court, consistent with the overwhelming majority of federal courts, has previously rejected such a contention. *See Joseph v. Algemene Bank Nederland, N.V.,* 592 F.Supp. 141, 146 (W.D.Pa.1984). Finally, we note that the *Sedima* Court laid to rest defendant's assertion that plaintiff must allege a distinct "racketeering injury," by holding that all a plaintiff need allege as a compensable injury is "harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise." *Sedima,* 473 U.S. at 497, 105 S.Ct. at 3286. *See also American National Bank and Trust Company of Chicago v. Haroco, Inc.,* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). Thus, defendant's "standing" challenges to plaintiff's RICO claims have no merit according to *Sedima.*

We now will address defendant's remaining challenges to plaintiff's RICO claims.

### A. Mail Fraud

The federal mail fraud statute, 18 U.S.C. § 1341, and the federal wire fraud statute, 18 U.S.C. § 1343, contain the following essential elements: 1) a scheme to defraud or obtain money or property by false pretenses; 2) use of mails [or interstate wires, including telephones] in furtherance of the scheme; and 3) culpable participation by the defendant. *United States v. Pearlstein,* 576 F.2d 531, 534 (3d Cir.1978). The broad reach of the mail and wire fraud statutes, coupled with the potential for treble damage awards has, in recent years, propelled civil RICO claims to the forefront of commercial litigation. The circumstances which once formed the basis for a conventional breach of contract action are now often pleaded as a RICO count. Nonetheless, because Congress included in RICO such broad predicate acts as mail fraud, wire fraud and violation of the securities laws, we are bound to apply RICO as Congress so intended.

The courts have liberally construed the phrase "scheme to defraud" to include "any plan, consummated by the use of the mails, in which artifice or deceit is employed to obtain something of value with

the intention of depriving the owner of his property." *United States v. Kreimer,* 609 F.2d 126, 128 (5th Cir.1980). The mailing need not be *essential* to the scheme to defraud; it need only *further* such a scheme. *United States v. Adamo,* 534 F.2d 31 (3d Cir.1976). In addition, the defendant himself need not use the mails since mail fraud can be established if the defendant instructed its agent to use them, or if the defendant precipitated the events which would foreseeably involve use of the mails. *United States v. Bloom,* 78 F.R.D. 591, 606–07 (E.D.Pa.1977).

Traditionally, the mail fraud statute was applied to schemes to defraud a person of something of economic value. Later decisions, however, extended its reach to encompass a breach of fiduciary duty where material non-disclosures amount to a scheme to defraud. *See, e.g., United States v. Bronston,* 658 F.2d 920 (2d Cir. 1981), *cert. denied,* 456 U.S. 915 (1982) (fiduciary violates mail fraud statute where he fails to disclose material information which he has a duty to disclose); *United States v. Barta,* 635 F.2d 999 (2d Cir.1980), *cert. denied,* 450 U.S. 998, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1981) (mail fraud statute covers a fraudulent scheme to deprive employer of his intangible right to an employee's honest services). Moreover, our Circuit Court, in *United States v. Boyer,* 694 F.2d 58 (3d Cir.1982) has held that the specific intent to deceive may be found from a material misstatement of fact made with reckless disregard of the facts. As the *Boyer* Court stated, "[n]o amount of honest belief that the enterprise would ultimately make money can justify baseless, false or reckless misrepresentations or promises." *Id.* at 60.

We note that the United States Supreme Court has recently limited the reach of the federal mail fraud statute, 18 U.S.C. § 1341, by holding that it protects only property rights and not the intangible right of the citizenry to good government. *McNally v. United States,* —— U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). Here, however, we find that plaintiff has sufficiently alleged that he was defrauded of tangible property—not an intangible right.

■■■ The relevant facts disclose that in the spring of 1978 NAVL placed an advertisement in the Sunday Pittsburgh Press which sought to recruit owner/operators and included both NAVL's address and telephone number. After responding to the ad, plaintiff received a brochure in the mail from NAVL which included an application and listed the types of available trucks. Plaintiff then made a telephone call to NAVL, which is located in Fort Wayne, Indiana, and was instructed to forward a $100.00 deposit to reserve a motel room near the NAVL facility in order that he attend a training session for new drivers. The NAVL recruiter also answered plaintiff's inquiries as to hospitalization benefits, guaranteed weekly pay and the type of available trucks. Plaintiff's Deposition at pp. 25–26, 30–31. We find that these representations made by defendant's recruiters concerned facts which are material to plaintiff's allegations of NAVL's scheme to defraud. Moreover, a genuine factual dispute exists as to whether NAVL should have disclosed its high turnover rate of owner/operators.

Finally, we find that each mailing or wire communication in furtherance of NAVL's recruiting of drivers, if unlawful, would constitute an indictable offense, even if undertaken pursuant to a single fraudulent scheme. *United States v. Weatherspoon,* 581 F.2d 595 (7th Cir.1978); *see also Alexander Grant and Co. v. Tiffany Industries, Inc.,* 770 F.2d 717, 718 n. 1 (8th Cir.1985) (pattern established by multiple acts of mail and wire fraud); *S.I. Handling Systems, Inc. v. Heishley,* 658 F.Supp. 362, 377 (E.D.Pa.1986) ("pattern" established by single scheme). Therefore, we are satisfied that the mailings coupled with the telephone communications are enough to establish the requisite "pattern" of racketeering activity required under 18 U.S.C. § 1961(5). Because we conclude that the acts of defendant were not sporadic, we reject defendant's position that plaintiff has failed to allege the requisite predicate acts of mail fraud. While defendant con-

tends that the relevant advertisement and brochures "speak for themself" and contain no misrepresentations of material facts, we disagree and believe that these documents provide information which a jury might ultimately find to be fraudulent.

## B. *Statute of Limitations*

■ Defendant next attacks plaintiff's RICO claims on the basis that they are barred by Pennsylvania's two year statute of limitations for common law fraud. 42 Pa.C.S. § 5524(7). Defendant contends that plaintiff knew or should have known of the alleged misrepresentations no later than 1979, yet he did not file his complaint until December 13, 1982, which is outside the two-year limitations period. *See* Defendant's Brief In Support of Its Motion for Summary Judgment at pp. 41–42. However, the United States Supreme Court has recently clarified the widespread uncertainty about this issue by holding that the four year statute of limitations of the Clayton Act, 15 U.S.C. § 15b, is to be applied uniformly to *all* civil RICO claims. *See Agency Holding Corp. v. Malley-Duff & Associates,* — U.S. ——, 107 S.Ct. 2759, 97 L.Ed. 121 (1987). Thus, defendant's contention that the instant dispute is barred by the two year limitations period of 42 Pa. C.S. § 5524 must fail.

Even if we were to apply the four year limitations period of the Clayton Act, defendant's motion for summary judgment could not be granted unless it were clear as a matter of law that plaintiff knew or should have known of the alleged violations on December 13, 1978, four years before the complaint was filed. Because the present record is unclear on this question, this issue would have to be resolved by the fact finder. *Kroungold v. Triester,* 407 F.Supp. 414, 419 (E.D.Pa.1975) (limitations issues requiring factual determination, "are best left to trial for resolution"). Accordingly, defendant's motion for summary judgment on the basis that plaintiff's RICO claims are time-barred will be denied. This issue is mooted, however, by the fact that we have held the plaintiff's RICO claims to be barred on other grounds.

## C. *"Enterprise" and "Person" Dichotomy*

■ Defendant's final attack on plaintiff's RICO claim is successful. NAVL argues that plaintiff has failed to properly plead a RICO "enterprise" which is distinct from the RICO "person." Because the alleged predicate acts of mail and wire fraud were performed by the agent-recruiters of NAVL, and since NAVL also constitutes the RICO enterprise, defendant contends that plaintiff's RICO claims should be dismissed as a matter of law as NAVL cannot be both the RICO "enterprise" and "person." *See, e.g., B.F. Hirsch v. Enright Refining Co., Inc.,* 751 F.2d 628, 634 (3d Cir.1984) ("a violation of section 1962(c) by a corporate entity requires an association with an enterprise that is not the same corporation"); *Chambers Development Co. v. Browning-Ferris Industries,* 590 F.Supp. 1528, 1541 (W.D.Pa.1984)) (same); *Yancoski v. E.F. Hutton & Co.,* 581 F.Supp. 88, 97 (E.D.Pa.1983) (enterprise can not be liable to plaintiff under § 1962(c)).

18 U.S.C. § 1961(3) defines "person" as including "any individual or entity capable of holding a legal or beneficial interest in property." "Enterprise" is defined in 18 U.S.C. § 1961(4) as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." In the instant case, there is no doubt that NAVL constitutes an "enterprise" as defined in § 1961(4). However, NAVL, acting through its agents, also is the "person" who allegedly committed the RICO violations. Thus, we must determine whether the same entity, NAVL, can be both the guilty person who committed the predicate acts (i.e., the defendant) and the actual "enterprise" which is infiltrated by the "person[s]".

This metaphysical person/enterprise dichotomy stems from the murky language of RICO, particularly § 1962(c) which makes it "unlawful for any *person* employed by or associated with any *enterprise*" from conducting the enterprise's af-

fairs "through a pattern of racketeering activity." 18 U.S.C. § 1962(c). We find the language requiring that a "person" be "employed by or associated with any enterprise" contemplates that the person will be distinct from the enterprise. Were RICO construed to allow a defendant, such as NAVL, also to be the enterprise, the whole concept of a RICO enterprise would be rendered insignificant. We find that the Congress would not have interjected such a complex element as a RICO enterprise into the statute had it merely wanted to outlaw certain racketeering activity and nothing more. *See United States v. Sutton*, 605 F.2d 260, 266 (6th Cir.1979).

The Court of Appeals for the Fourth Circuit persuasively justified the enterprise/person dichotomy in *United States v. Computer Sciences Corp.*, 689 F.2d 1181 (4th Cir.1982), *cert. denied*, 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983) when it stated:

> We conclude that 'enterprise' was meant to refer to a being different from, not the same as or part of, the person whose behavior the act was designed to prohibit and, failing that, to punish.... we would not take seriously, in the absence, at least, of very explicit statutory language, an assertion that a defendant could conspire with his right arm, which held, aimed and fired the fatal weapon.

*Id.* at 1190. An overwhelming majority of federal courts have followed this distinction. *See, e.g., Roeder v. Alpha Industries, Inc.*, 814 F.2d 22, 28–29 (1st Cir. 1987); *Bennet v. United States Trust Co.*, 770 F.2d 308 (2d Cir.1985), *cert denied*, 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986); *Rae v. Union Bank*, 725 F.2d 478 (9th Cir.1984); *Bennett v. Berg*, 685 F.2d 1053 (8th Cir.1982), *aff'd en banc*, 710 F.2d 1361, *cert. denied*, 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983); *Klapper v. Commonwealth Realty Trust*, 657 F.Supp. 948, 955 (D.Del.1987); *Kirschner v. Cable/Tel Corp.*, 576 F.Supp. 234, 243 (E.D. Pa.1983). *But see United States v. Hartley*, 678 F.2d 961, 988 (11th Cir.1982), *cert. denied*, 459 U.S. 1183, 103 S.Ct. 834, 74 L.Ed.2d 1027 (1983). Moreover, the Court of Appeals for the Seventh Circuit in *Haro-*

*co, Inc. v. American National Bank and Trust Company of Chicago*, 747 F.2d 384, 401–02 (7th Cir.1984), *aff'd on other grounds*, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985), firmly concluded that the defendant must be distinct from the enterprise in an action founded upon § 1962(c).

While the *Haroco* Court noted, in dicta, that this distinction does not apply to actions brought under § 1962(a), 747 F.2d at 402, in this case plaintiff's RICO claims have been consistently framed upon a violation of § 1962(c). *See* plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment at p. 68. Nowhere in the pleadings or in the record is there any mention of § 1962(a), which prohibits using the proceeds of racketeering activities to infiltrate legitimate businesses. We note that § 1962(a) requires different elements of proof from § 1962(c), the subsection upon which plaintiff bases his RICO claims. *See Gilbert v. Prudential-Bache Securities, Inc.*, 643 F.Supp. 107, 109 (E.D.Pa. 1986) ("A person who may have been injured by the predicate acts of racketeering cannot be said to have thereby been injured by the investment of the proceeds"). Here, plaintiff is a person who was allegedly injured by a pattern of racketeering activity conducted by the employees of NAVL, and his RICO claims obviously arose under § 1962(c). While the requirement of an enterprise separate from the person may not be fatal to RICO claims brought under § 1962(a), *see Hirsch, supra*, plaintiff's claims cannot be based on that subsection of the statute since plaintiff has never contended that he was injured by the investment of the proceeds of racketeering activities. *Gilbert, supra*. Therefore, we conclude that NAVL cannot be both the defendant and the enterprise in an action founded upon § 1962(c). *Hirsch, supra*.

This result "is consistent with the Congressional scheme to orient Section 1962(c) toward punishing the infiltrating criminals rather than the legitimate corporation which might be an innocent victim of the racketeering activity in some circumstances." *B.F. Hirsch, supra*, 751 F.2d at 634.

"If Section 1962(c) were read any other way, an anomalous result would be reached—namely, the person would be employed by or associated with itself." *Klapper*, 657 F.Supp. at 955 (citation omitted). *Cf. Seville Industrial Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 790 (3d Cir.1984), *cert. denied*, 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985) (essence of RICO offense is a defendant acting through or upon an enterprise).

Plaintiff attempts to avoid the requirement in this Circuit that the enterprise be distinct from the person by emphasizing that the predicate acts were committed by the agents of NAVL; thus, he argues, the agents are the actual "persons"—not NAVL. We disagree and find no basis for imposing liability under the theory of *respondeat superior*.

> To allow liability to be attributed to the "enterprise" because it employed the RICO "person" would place the onus of the RICO violation on the "enterprise." It would place the corporate "enterprise" in the same position, subject to the same liability, as the employee "person." It makes little sense to require that the "enterprise" and the "person" be distinct, but then to impute liability from the "person" to the "enterprise" as a matter of course when the "enterprise" employs the "person." Such a result is simply inconsistent with the framework of the statute and the intent of Congress.

*Continental Data Systems, Inc. v. Exxon Corp.*, 638 F.Supp. 432, 440 (E.D.Pa.1986). *See Roche v. E.F. Hutton & Co., Inc.*, 658 F.Supp. 315, 317 (M.D.Pa.1986) (court notes in dicta that it is doubtful that *respondeat superior* would impose liability indirectly when *B.F. Hirsch* prohibits same recovery directly); *Gilbert v. Prudential-Bache Securities, Inc., supra*, 643 F.Supp. at 108 (expressly rejects *respondeat superior* theory). *But see Bernstein v. IDT Corp.*, 582 F.Supp. 1079 (D.Del.1984) (utilizes apparent authority principle of agency law to impose RICO liability on employer enterprise).

Recently, in *Petro-Tech, Inc., et al. v. The Western Company et al.*, 824 F.2d 1349 (3d Cir.1987), our Circuit Court unequivocally held that "a corporation which is alleged to be a RICO enterprise under 18 U.S.C. § 1962(c) cannot be held vicariously liable for RICO violations committed by its employees if the employees are the § 1962(c) persons named in the complaint as having conducted the affairs of the enterprise through a pattern of racketeering activity." At 1351. We find this language to be dispositive of the issue before us.

Also persuasive is the reasoning of *Tarasi v. Dravo Corp.*, 613 F.Supp. 1235 (W.D. Pa.1985), where Judge Weber held that the fact that the predicate acts were performed by agents of defendant Dravo Corporation was irrelevant because a corporation can only act through its agents. *Id.* at 1237. By analogy, we have previously held that a corporation and its employees are not capable of conspiring together because they are legally the same "person." *Cf. Chambers Development Co., supra*, 590 F.Supp. at 1541–42; *see generally Landmark Savings & Loan v. Rhoades*, 527 F.Supp. 206, 209 (E.D.Mich.1981) (rejecting RICO conspiracy between corporation and its agents). As such, we find no merit in plaintiff's contention that *B.F. Hirsch* is factually distinguishable since there the plaintiff charged the corporation itself with performing the predicate acts whereas, here, plaintiff charged the agents-recruiters of NAVL with such conduct.

Finally, plaintiff argues in the alternative that even if *B.F. Hirsch* was once controlling, it has been implicitly overruled by the Supreme Court in its *Sedima* decision. We find this argument to be baseless as the precise issue before us was not even addressed by the *Sedima Court*. *See Tarasi, supra*, 613 F.Supp. at 1237 (identical argument rejected). Thus, we hold that the law of this Circuit, as pronounced in *B.F. Hirsch*, and *Petro-Tech, Inc.*, require a civil RICO plaintiff to plead an enterprise which is distinct from the defendant or person when bringing a claim pursuant to 18 U.S.C. § 1962(c). Accordingly, we will grant defendant's motion for summary judgment on Counts III and IV.

## V. Plaintiff's Common Law Fraud Claim

### A. Rule 9(b)

Defendant alleges that Count V of plaintiff's Amended Complaint does not plead fraud with the requisite particularity under Fed.R.Civ.P. 9(b) which provides, in pertinent part, that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Our Circuit Court has recently clarified this standard in *Seville Industrial Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d at 791 wherein it stated:

> Rule 9(b) requires plaintiffs to plead with particularity the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior. It is certainly true that allegations of 'date, place or time' fulfill these functions, but nothing in the rule requires them. Plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud.

*Id.*

While Rule 9(b) requires particularity to an extent, it must not be construed to defeat the liberal spirit of the federal rules which provide a flexible approach to pleadings. Fed.R.Civ.P. 8(f) ("all pleadings shall be construed so as to do substantial justice"). *See Kimmel v. Peterson*, 565 F.Supp. 476, 481 (E.D.Pa.1983) (Rule 9(b) "is not to be applied with draconian strictness" even though it requires slightly more than notice.).

All that is necessary to fulfill the particularity requirement of Rule 9(b) is that the complaint set forth plaintiff's claims with sufficient detail to allow the defendant to answer and prepare for trial. *Beascoecha v. Sverdrup & Parcel Associates, Inc.*, 486 F.Supp. 169, 174 (E.D.Pa.1980). Thus, the dual purpose of Rule 9(b) is to protect defendants from unfair surprise and to assure that they receive notice of the nature of the claims asserted against them. *Simcox v. San Juan Shipyard, Inc.*, 754 F.2d 430, 440 (1st Cir.1985).

After reviewing plaintiff's amended complaint, we find that the requirements of Rule 9(b) have been satisfied. Plaintiff has set forth specific times, dates and places in his amended complaint which provide sufficient notice to defendant of its alleged fraudulent conduct. Because plaintiff has incorporated by reference all of his previous allegations into Count V, several of which detail the alleged fraudulent acts, we find no merit in defendant's Rule 9(b) argument.

While we have dismissed plaintiff's consumer fraud and RICO claims as a matter of law, we note that the underlying factual basis of those claims sufficiently present the basic elements of common law fraud which are: " '(1) a misrepresentation, (2) a fraudulent utterance thereof, (3) an intention by the maker that the recipient will thereby be induced to act, (4) justifiable reliance by the recipient upon this misrepresentation, and 5) damage to the recipient as the proximate result.' " *Scaife Co. v. Rockwell-Standard Corp.*, 446 Pa. 280, 285, 285 A.2d 451, 454 (1971), *cert. denied*, 407 U.S. 920, 92 S.Ct. 2459, 32 L.Ed.2d 806 (1971) (citation omitted). *See Michelson v. Exxon Research & Engineering*, 629 F.Supp. 418, 423 (W.D.Pa.1986).

It is well settled that fraud is proved when it is shown that the false representation was made knowingly, or in conscious ignorance of the truth, or recklessly without caring whether it be true or false. *Warren Balderston Co. v. Integrity Trust Co.*, 314 Pa. 58, 170 A. 282 (1934). It has also been established that "the deliberate nondisclosure of a material fact amounts to a culpable misrepresentation no less than does an intentional affirmation of a material falsity." *Neuman v. Corn Exchange National Bank & Trust Co.*, 356 Pa. 442, 450–52, 51 A.2d 759, 764 (1947). Yet, a misrepresentation innocently made is also actionable if it relates to a matter material to the transaction involved; while if the misrepresentation is made knowingly or involves a non-privileged failure to disclose, materi-

ality is not a requisite to the action. *Shane v. Hoffmann,* 227 Pa.Super. 176, 324 A.2d 532 (1974). A misrepresentation is material when it is of such a character that if it had not been made, the transaction would not have been entered into. *Greenwood,* 239 Pa.Super. at 378, 357 A.2d at 607. One deceived need not prove that fraudulent misrepresentation was the sole inducement to the investment of money, a material inducement is sufficient. *Neuman* 356 Pa. at 454, 51 A.2d at 765.

*Delahanty v. First Pennsylvania Bank,* 318 Pa.Super. 90, 107–08, 464 A.2d 1243, 1252 (1983).

In the instant dispute, the trier of fact must determine whether NAVL, by virtue of its contractual relationship with plaintiff, should have disclosed to plaintiff its high turnover rates, repossession of truck ratio, limits on "trip leasing," availability of loads, etc. Moreover, the trier of fact must also determine whether the actual information disseminated by NAVL, through its brochures and by its recruiters' representations, was fraudulent. Because plaintiff has set forth far more than boilerplate allegations of fraud, defendant's contention that plaintiff has violated Fed.R. Civ.P. 9(b) lacks merit.

**B.** *Statute of Limitations*

As it did regarding the RICO counts, defendant raises the two-year limitations period of 42 Pa.C.S. § 5524(7) as a bar to plaintiff's fraud claim. Plaintiff, in response, contends that Pennsylvania's residual six-year statute of limitations applies. 42 Pa.C.S. § 5527(6). Because plaintiff's cause of action accrued prior to the effective date of § 5524(7), which was February 18, 1983, the applicable limitations period is six years pursuant to § 5527(6). *A.J. Cunningham Packing v. Congress Financial Corp.,* 792 F.2d 330 (3d Cir. 1986); *Monkelis v. Scientific Systems Services,* 653 F.Supp. 680, 684 (W.D.Pa.1987).

Accordingly, we will deny defendant's motion for summary judgment on Count V.

An appropriate order will issue.

ORDER

AND NOW, to-wit, this 4th day of September, 1987, for the reasons stated in the accompanying opinion, it is hereby ORDERED, ADJUDGED and DECREED that

1) Defendant's Motion for Summary Judgment be and hereby is GRANTED on Counts I, II, III and IV of Plaintiff's Second Amended Complaint; and

2) Defendant's Motion for Summary Judgment be and hereby is DENIED with respect to Count V of Plaintiff's Second Amended Complaint.