Arlene CHALFIN, Harry Chalfin,
Richard Chalfin, Alan Chalfin
and Susan Chalfin–Dughi

v.

BEVERLY ENTERPRISES, INC.

Civ. A. No. 87–3319.

United States District Court,
E.D. Pennsylvania.

June 26, 1989.

Stephen A. Feldman, Philadelphia, Pa., for plaintiffs.

Robert St. Leger Goggin, Philadelphia, Pa., for defendant.

## MEMORANDUM

LOWELL A. REED, Jr., District Judge.

This is an action brought pursuant to Title XIX of the Social Security Act, 42

U.S.C. §§ 1396–1396i, and the regulations promulgated thereunder, commonly known as the Medicaid Program. Plaintiffs allege *inter alia* that defendant, owner and operator of the Rosemont Manor Nursing Home where Mrs. Arlene Chalfin was a patient from November to December 1986, violated the Social Security Act by discharging Mrs. Chalfin against her will and without the proper justification.[1] Jurisdiction is founded upon diversity, 28 U.S.C. § 1332.[2]

Before the court is the motion of the defendant Beverly Enterprises to dismiss counts I, II, III, IV, and VII of the complaint as to all the plaintiffs, and to dismiss count V with respect to Harry Chalfin, Richard Chalfin, Alan Chalfin and Susan Chalfin–Dughi, and the cross motion of the plaintiffs for summary judgment on their contract claim (count VI).[3] For the reasons set forth below, the motion of the defendant will be granted as to counts I, II, III, IV and V, granted in part and denied in part as to count VII, and plaintiffs' cross motion for summary judgment will be denied.

I

*Factual Background*

Plaintiff, Arlene Chalfin, was admitted on or about November 11, 1986 to the Rosemont Manor Nursing Home which is owned and operated by the defendant, Beverly Enterprises, Inc. The plaintiff was, and still is, suffering from Alzheimer's Disease, and at the time of her admission was recovering from a seizure which caused multiple fractures. As a result of those injuries, Mrs. Chalfin was unable to ambulate at that time. Plaintiff was admitted to defendant's facility as a private patient.[4]

1. Plaintiffs also bring claims for breach of contract (count VI) and intentional infliction of emotional distress (count V).

2. Although several counts of plaintiffs' complaint are brought under the Social Security Act, at the oral argument, both parties agreed that jurisdiction was based on diversity. Because the parties are in fact citizens of different states, despite my dismissal of plaintiffs' federal claims, this court maintains jurisdiction over any valid state claims brought by plaintiffs pursuant to 28 U.S.C. § 1332.

3. The court held oral argument on the motions on December 19, 1988.

4. It is undisputed that, at least at the time of her admission to Rosemont, Mrs. Chalfin was a private care patient. The parties, however, dispute the time Mrs. Chalfin actually applied for medical assistance. Defendant claims that Mrs.

Plaintiffs assert that immediately after Mrs. Chalfin was admitted, her husband, Dr. Chalfin, asked a Rosemont social worker about the application process for Medical Assistance. Plaintiff further contends that the social worker informed Dr. Chalfin that "Medicaid beds" were generally unavailable. The social worker then advised Rosemont's administrator, Susan Ulmer about the inquiry at which time she reiterated to Dr. Chalfin the fact that the facility had no "Medicaid beds" available. At the time, the administrator indicated to Dr. Chalfin that she would be willing to help the family find another facility.

Plaintiffs contend that after they declined to place Mrs. Chalfin in a different facility, "Rosemont's administrator began a pattern of harassment designed to coerce the family to seek out another facility." The alleged harassment included verbal abuse of the family, refusing to permit the family from being involved in their spouse and mother's care, refusing to permit the family to touch her and attempting to evict plaintiff on the day before Thanksgiving. As a result of this attempt to evict her, the plaintiffs filed a complaint with the Department of Health.

The defendant denies that any harassment or discrimination ever took place at Rosemont and asserts that it only attempted to discharge Mrs. Chalfin on November 22nd after the Director of Nursing discovered Mrs. Chalfin's husband, a dentist, performing a dental procedure on his wife without prior permission or notice to anyone on the Rosemont staff. As a result, defendant contends that it was concerned that it could not adequately care for Mrs. Chalfin under these conditions and therefore issued her and her family a 30–day notice to relocate. Following a meeting with the Chalfins and the Rosemont Administrator on November 24th, the 30–day notice was withdrawn. Subsequently, the plaintiffs withdrew their pending complaint with the Department of Health.

On the evening of December 19, 1986, Mrs. Chalfin was transferred to Bryn Mawr Hospital. The defendant asserts that the reason Mrs. Chalfin was transferred was because her medical condition worsened and she was transferred with the approval of her treating physician. Plaintiffs contend that Mrs. Chalfin's treating physician, Dr. Rowland, never actually consented to and approved the transfer as he was not on call at that time and that a different doctor covering for him actually ordered the transfer. Plaintiffs assert that Dr. Rowland signed the discharge summary only after the fact and never approved the transfer prior to her admission to the hospital.

Plaintiffs state that following the transfer, after Dr. Chalfin inquired about holding the bed, Rosemont's administrator advised him to collect the balance of the funds which had been paid through December. Defendant contends that it was because of Mrs. Chalfin's serious medical condition that it advised the plaintiffs that Rosemont could no longer care for Mrs. Chalfin.

The present litigation ensued, with Mrs. Chalfin and her family filing a seven count complaint seeking damages under Title XIX of the Social Security Act, 42 U.S.C. § 1396–1396i (1982 & Supp. IV 1986), the Pennsylvania Health Care Facilities Act, 35 Pa.Stat.Ann. §§ 448.101–448.904 (Purdon Supp.1989), the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa.Stat.Ann. §§ 201–1 to 201–9.2 (Purdon 1971 & Supp.1989), and state law breach of

Chalfin was denied eligibility for medical assistance at the time she was admitted to Rosemont. Plaintiffs, however, contend that Mrs. Chalfin did not even apply for medical assistance until December 3, 1986. Additionally, plaintiffs assert that the document defendant submits as support for its position that Mrs. Chalfin was denied medical assistance is simply a letter providing "routine notice" signed by and given to patients by the nursing home provider and not

by the Medicare intermediary, when, *in the opinion of the provider,* the services will not be covered by Medicare. In the alternative, plaintiffs argue that even if this document does represent a denial of benefits to Mrs. Chalfin, it is actually a denial of coverage for Medicare under Title XVIII of the Social Security Act and not for medical assistance under Title XIX of the Social Security Act.

contract and intentional infliction of emotional distress claims.

## II

*Discussion*

### Medicaid

Medicaid is a joint federal-state program organized under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396–1396i and the regulations promulgated thereunder, providing medical assistance benefits to qualified recipients through the recipient's state. The bill was "designed to liberalize the Federal law under which states operate their medical assistance programs so as to make medical services for the needy more generally available." S.Rep. No. 404, 89th Cong., 1st Sess., *reprinted in* 1965 U.S. Code Cong. & Admin.News 1943, 2014.

██ In accordance with Title XIX, the federal government reimburses qualifying states for a portion of expenditures made by such states for certain medical care and services provided to eligible recipients by qualified providers. An individual is entitled to Medicaid if she fulfills the criteria established by the state in which she lives. In order for a state to qualify for federal reimbursements, the state must establish an approved state plan for medical assistance which meets established federal guidelines. Accordingly, although states are in no way obligated to participate in the program, if a state chooses to participate, it must comply with federal regulations. *See Roberson v. Wood,* 464 F.Supp. 983, 984 (E.D.Ill.1979); *Fuzie v. Manor Care, Inc.,* 461 F.Supp. 689, 693 (N.D.Ohio 1977).

Each participating state maintains the primary responsibility for implementing the Medicaid Program, for determining recipient eligibility for participation, and for ensuring that "care and services under the plan will be determined, and such care will be provided, in a manner consistent with simplicity of administration and the best interests of the recipients." 42 U.S.C. § 1396a(a)(19) (1982). Generally, states, rather than providing medical assistance directly, enter into provider agreements for a term of years with state-certified health care facilities who are willing to act as health care providers. This term is usually automatically renewed unless the health care provider is either decertified for failing to satisfy state requirements or voluntarily terminates the arrangement. *See Bumpus v. Clark,* 681 F.2d 679, 682 (9th Cir.1982), *withdrawn as moot,* 702 F.2d 826 (9th Cir.1983).

### Implied Right of Action

██ The primary issue in this case and the linchpin upon which it turns, is whether a private right of action may be implied under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396–1396i (1982 & Supp. IV 1986). While the issue is one of first impression in this circuit, several district courts and one court of appeals have had occasion to expressly confront this issue and have reached different conclusions. *Compare Stewart v. Bernstein,* 769 F.2d 1088, 1093 (5th Cir.1985) (private right of action may not be implied under the statute); *Wagner v. Sheltz,* 471 F.Supp. 903, 910 (D.Conn.1979) (same); *Fuzie v. Manor Care, Inc.,* 461 F.Supp. 689, 697 (N.D.Ohio 1977) (same) *with Roberson v. Wood,* 464 F.Supp. 983, 989 (E.D.Ill.1979) (recognizing an implied private right of action under the statute); *Berry v. First Healthcare Corporation,* Medicare & Medicaid Guide (CCH) ¶ 28,693 (D.N.H. Oct. 26, 1977) (same). Because I find no evidence that Congress intended to create a private right of action under the statute,[5] and because it is well

---

5. In their briefs and at oral argument, plaintiffs argued that defendant violated section 1919(c) of the Social Security Act which was recently promulgated by Congress as an amendment to the Social Security Act. Plaintiffs argue that the court must decide this motion in the context of these amendments because it is "the law in effect at the time [a court] renders its decision" which prevails. While I accept plaintiffs' position that I must apply the law in effect at the time that I render my decision, *see Thorpe v. Housing Authority,* 393 U.S. 268, 281, 89 S.Ct. 518, 525, 21 L.Ed.2d 474 (1969), it is clear that section 1919(c) of the Act does not take effect until October 1, 1990. *See* Omnibus Budget Reconciliation Act, Pub.L. No. 100–203, § 4214(a), 101 Stat. 1330–182, 1330–219 (1987).

established that "[t]he federal judiciary will not engraft a remedy on a statute, no matter how salutary, that Congress did not intend to provide," *California v. Sierra Club,* 451 U.S. 287, 297, 101 S.Ct. 1775, 1781, 68 L.Ed.2d 101 (1981), I hold that plaintiffs may not maintain a private action under Title XIX of the Social Security Act.

The test used to determine whether a private right of action may be implied from a federal statute was articulated by the Supreme Court in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). "The question ... is one of statutory construction, and the key to the inquiry is the intent of the legislature." *Plucinski v. I.A.M. National Pension Fund,* 875 F.2d 1052, 1055 (3d Cir.1989) (citing *Northwest Airlines, Inc. v. Transport Workers Union of America,* 451 U.S. 77, 91, 101 S.Ct. 1571, 1580, 67 L.Ed.2d 750 (1981)). *See also Barron v. Nightingale Roofing, Inc.,* 842 F.2d 20, 21 (1st Cir.1988). The four inquiries *Cort* established are: (1) "[I]s the plaintiff 'one of the class for whose *especial* benefit the statute was enacted' ... that is, does the statute create a federal right in favor of the plaintiff?" *Cort,* 422 U.S. at 78, 95 S.Ct. at 2087 (quoting, in part, *Texas & Pacific Railroad Co. v. Rigsby,* 241 U.S. 33, 39, 36 S.Ct. 482, 484, 60 L.Ed. 874 (1916)). (2) "[I]s there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?" *Id.* (3) "[I]s it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?" *Id.* (4) "[I]s the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?" *Id.*

The first court to confront the issue of whether an implied right of action may be implied under Title XIX of the Social Security Act was *Fuzie v. Manor Care, Inc.,* 461 F.Supp. 689 (N.D.Ohio 1977). In *Fuzie,* a Medicaid recipient resident at a private nursing facility brought suit against the owner and operator of such facility in an attempt to enforce the provisions of certain regulations promulgated by the Secretary of Health Education & Welfare under the Medicaid Program. Plaintiff in *Fuzie* asserted that the defendant had engaged in a systematic program of transferring or discharging from its facility all patients who are Medicaid recipients with the exception of those who became eligible for Medicaid subsequent to exhausting their assets as private patients. As a result, the plaintiff in *Fuzie* contended that the transfers or discharges were being effected for other than medical reasons.

Using the *Cort* criteria, *Fuzie* found that a private right of action may not be implied from the legislative scheme of Title XIX and therefore should not be judicially created. *Id.* at 696–97. Under the first prong of the *Cort* test, the court found that the plaintiff, a Medicaid recipient, was among the class of persons for whose benefit the legislation was enacted, but found that "the plaintiff [did] not possess an absolute right not to be transferred." *Id.* at 696. The *Fuzie* court then determined, under the second prong of the *Cort* inquiry, that "the Medicaid Act and the regulations contemplate administrative rather than judicial enforcement of the legislation's requirements," *id.,* and therefore that the second part of the *Cort* test mandated that no private right of action should be implied. *Fuzie,* evaluating the third requirement of *Cort* to determine whether it was consistent with the underlying purpose of the particular legislative scheme to imply such a remedy, found that the creation of a private remedy in this situation "would disrupt the implementation of the Medicaid Program." *Id.* Finally, the court found that there were sufficient state remedies available to the plaintiff and that "the creation of a federal right of action will disserve the administrative nature of the Medicaid program, whereas committing the plaintiff to her state remedies is consistent with the primary state implementation of the program."

The only court of appeals to consider this issue has held that Title XIX does not provide for a private right of action. In

Accordingly, I will not consider these amendments while ruling on the pending motions.

*Stewart v. Bernstein,* 769 F.2d 1088 (5th Cir.1985), the Fifth Circuit reviewed a district court's finding that Congress did not intend to create a judicially enforceable cause of action between Medicaid residents and their private nursing homes and reasoned that there was "nothing in either the statute or the legislative history which would suggest that Congress intended to create such a remedy." *Id.* at 1092. The court held that absent any direct evidence of congressional intent, no federal cause of action existed against the private nursing home. *Id.* at 1093. Moreover, the court found that "[t]he Act contemplates certain kinds of judicial enforcement to secure certain kinds of individual rights; it does not envision suit by a recipient against her private provider of services." *Id.* at 1094 (footnote omitted).

Plaintiffs argue that *Stewart* does not provide persuasive support for the instant case because a "doctrine" exists in the Fifth Circuit which precludes a court from using a federal regulation as a means of engrafting a private right of action. Plaintiffs position is based on the following language found in a footnote in *Stewart:*

> The only "rights" cited by appellant appear in the federal regulations and protect, among other things, a patient's ability to refuse medication, to be transferred for good cause, and to receive adequate notice and pre-transfer preparation. 42 C.F.R. § 405.1121(k); *see also id.* § 442.311 (ICF patients' bill of rights). As we note below, these regulatory rights are enforceable by means other than a civil suit under the Medicaid Act against a private provider of services. In any event, the federal regulations cannot themselves create a cause of action; this is a job for the legislature.

*Stewart,* 769 F.2d at 1092–93 n. 6. Contrary to plaintiffs suggestion, however, far from being an aberration in the Fifth Circuit, it is in fact a well established tenet of statutory construction expressly adopted by the United States Supreme Court that "[t]he rulemaking power granted to an administrative agency charged with the administration of a federal statute is not the power to make law. Rather, it is 'the power to adopt regulations to carry into effect the will of Congress as expressed by the statute.'" *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 213–14, 96 S.Ct. 1375, 1391, 47 L.Ed.2d 668 (1976) (quoting, in part, *Dixon v. United States,* 381 U.S. 68, 74, 85 S.Ct. 1301, 1305, 14 L.Ed.2d 223 (1965) and *Manhattan General Equipment Co. v. Commissioner,* 297 U.S. 129, 134, 56 S.Ct. 397, 399, 80 L.Ed. 528 (1936)), *reh'g denied,* 425 U.S. 986, 96 S.Ct. 2194, 48 L.Ed.2d 811 (1976). *See also Touche Ross & Co. v. Redington,* 442 U.S. 560, 577 n. 18, 99 S.Ct. 2479, 2487 n. 18, 61 L.Ed.2d 82 (1979) (language of statute and not the rules must control). Thus, it is axiomatic that "[a] rule or regulation promulgated under the authority of a federal statute cannot alone provide the source of an implied right of action if the specific language of the statute does not authorize such a result." *Rousseau v. City of Philadelphia,* 589 F.Supp. 961, 971 (E.D.Pa.1984). Accordingly, I reject plaintiffs' position on this issue and will look only to the statute itself and its legislative history to determine whether a private right of action may be implied under Title XIX.

Applying the *Cort* factors to the reasoning of the case *sub judice,* I conclude, as did the Fifth Circuit in *Stewart* and the district court in *Fuzie,* that there is no evidence that Congress intended to provide for a private right of action under the Social Security Act and therefore, that the plaintiffs may not maintain this action against the defendant health care provider.

The first prong of the *Cort* analysis—the question of whether Mrs. Chalfin is a member of the class for whose benefit the statute was enacted—is a potentially thorny one. The parties vociferously disagree over whether Mrs. Chalfin is to be considered a "Medicaid recipient" within the meaning of Title XIX of the Social Security Act. Defendant asserts that the benefits of the statute are not triggered until an individual becomes a Medicaid recipient and, therefore, because Mrs. Chalfin was not actually receiving Medicaid during her stay at Rosemont, she cannot be considered a "Medicaid recipient" under the Act. In

other words, defendant argues that actual receipt of Medicaid is a condition precedent to an individual falling within the parameters of the statute. Plaintiffs, on the other hand, contend that Title XIX affords protection not only to individuals actually receiving Medicaid but to persons *eligible* to receive Medicaid as well. I agree. The legislative history of the Act as well as the regulations promulgated thereunder reveal an underlying intent to protect individuals striving to qualify for Medicaid as well as those actually receiving the assistance. Moreover, Mrs. Chalfin alleges that her delay in actually qualifying for Medicaid was at least in part the result of the defendant's conduct. One of the gravamen of Mrs. Chalfin's complaint is that she was the victim of discriminatory practices based upon her attempt to apply for medical assistance. It would strain reasonable notions of fairness to find that Mrs. Chalfin was not a member of the class for whose benefit the statute was enacted when the very core of her argument is that she was discriminated against in an attempt to avail herself of the benefits of Medicaid by attempting to apply for its assistance. Therefore, although it is true that she was not actually receiving medical assistance at the time, I find that Mrs. Chalfin is nevertheless a member of the class for whose benefit the statute was enacted, and thus falls within the ambit of the statute.

Recently, the Supreme Court made it abundantly clear that a court, in deciding whether a private right of action exists, is to be guided by congressional intent rather than judicially supplied policy considerations. *See California v. Sierra Club*, 451 U.S. 287, 293, 297, 101 S.Ct. 1775, 1779, 1781, 68 L.Ed.2d 101 (1981); *Transamerica Mortgage Advisors v. Lewis*, 444 U.S. 11, 15–16, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979). Thus, although *Cort* established a four part inquiry, it is clear that the two crucial elements of the *Cort* analysis are the second and third prongs which instruct a court to analyze the statute's legislative history to determine whether Congress intended a court to imply a private right of action under a particular statute. *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575–76, 99 S.Ct. 2479, 2489, 61 L.Ed.2d 82 (1979).

A review of the legislation under the second and third *Cort* factors, compels me to conclude that a private right of action may not be implied under the Act because it is clear that Congress did not intend to include a private right of action as part of the legislative scheme of Title XIX.

First, turning to the second prong of the *Cort* analysis, I find, after a careful examination of the legislative history of Title XIX, that there is no indication that Congress intended, either explicitly or implicitly, for a private care patient to bring a private action for money damages under the statute. Especially compelling is the fact that Congress explicitly provided for federal judicial review of an administrative determination that an individual is not eligible for benefits under Title XVIII, *see* 42 U.S.C. § 1395ff(b)(1), while remaining completely silent on the very same issue under Title XIX. "This omission of private federal judicial remedies under Title XIX is indicative of a Congressional intent that such not be implied." *Fuzie*, 461 F.Supp. at 697.

I believe that the third *Cort* factor—whether implying a private remedy is consistent with the underlying purposes of the legislative scheme—mandates a finding that plaintiffs may not properly bring a private action for money damages under Title XIX. It is clear from the legislative history that, rather than focusing on the individual patient, the legislation is primarily directed at the role of participating *states* in providing medical care with the assistance of federal funds. The bill attempts to outline certain requirements which the *state* must comply with in order to become and remain eligible for federal funding. *See* S.Rep. No. 404, 89th Cong., 1st Sess., *reprinted in* 1965 U.S.Code Cong. & Admin.News 1943, 2014. It is clear that "[t]he Medicaid program is not intended to meet all the medical needs of recipients. Rather, its goal is to provide medical assistance 'as far as practicable under the conditions of [each] State.'" *Bumpus v. Clark*, 681 F.2d 679, 684 (9th Cir.1982) (quoting, in part, 42 U.S.C.

§ 1396), *withdrawn as moot*, 702 F.2d 826 (9th Cir.1983)).[6]

Finally, I agree with Judge Krupansky's concern in *Fuzie* that "[a] private right of action, utilized to enforce specific, limited portions of federal regulations on an *ad hoc* basis would circumvent the responsibility of the state to administer its plan in an organized manner 'consistent with simplicity of administration and the best interests of the recipients,' transferring the primary obligation in such cases from the administrative personnel intended to bear it to the federal courts." *Fuzie*, 461 F.Supp. at 697. (citation omitted).

Plaintiffs rely heavily upon *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) as support for their position that this court should recognize an implied private right of action under Title XIX of the Social Security Act. *Cannon* involved a challenge by a woman who alleged she was excluded, on the basis of her gender, from participation in the medical education programs of private universities receiving federal financial assistance. Section 901(a) of Title IX of the Education Amendments of 1972 provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance." The Court held that although the statute did not ex-

pressly authorize a private right of action, the history of Title IX "plainly indicates that Congress intended to create such a remedy." *Id.* at 676. The Court found that Title IX was specifically patterned after Title VI of the Civil Rights Act of 1964 and that, when Title IX was enacted, "the critical language in Title VI had already been construed as creating a private remedy." *Id.* at 696. The Court went on to explain that "Congress intended to create Title IX remedies comparable to those available under Title VI and that it understood Title VI as authorizing an implied private cause of action for victims of the prohibited discrimination." *Id.* at 703.

██ In contrast to Title IX of the Education Amendments of 1972, I find nothing in either the legislative history of Title XIX of the Social Security Act or in the language of the statute itself which indicates an intent—either explicit or implicit—on the part of Congress to imply such a private right of action.[7] "While not automatically fatal to an implied right of action, legislative silence on the matter does not favor creation of the right unless the language or structure of the statute, or the circumstances of its enactment, persuade otherwise." *National Temple Non–Profit Corporation v. National Temple Community Federal Credit Union*, 603 F.Supp. 807, 808 (E.D.Pa.1985). After a thorough examination of both the history of the Act and the language and structure of the stat-

---

**6.** At oral argument, counsel for the defendant represented to the court that the Ninth Circuit in *Bumpus* held that there was no private right of action under Title XIX of the Social Security Act. I wish to note that this reading of *Bumpus* is incorrect and I do not in any way rely on or cite *Bumpus* for that proposition. In *Bumpus*, the Ninth Circuit expressly declined to reach the issue of whether a private right of action may be implied under the Act, finding that because Title XIX did not give rise to the substantive rights claimed by the plaintiffs in that case, it was not compelled to reach the issue of whether such substantive rights would be enforceable by such an action. *Bumpus*, 681 F.2d at 685 n. 1.

**7.** Plaintiffs contend that the district court's analysis in *Fuzie* is in conflict with *Cannon* and that *Fuzie* must therefore be reevaluated in light of *Cannon*. I find this argument to be fallacious as *Fuzie* and *Cannon* do not in any way

conflict. Far from changing the law or expanding the way a court should approach this type of analysis, *Cannon* reaffirmed *Cort v. Ash*, using the *Cort* analysis to determine that a private right of action may be implied under Title IX of the Education Amendments of 1972. The law remains today, as it was before *Cannon* was decided, that the *Cort* factors are to be used in a judicial determination of whether a private right of action should be implied under a particular federal statute. Both *Fuzie* and *Cannon* utilized this analysis to evaluate whether a private right of action could be implied under the federal statute at issue. *Cannon* applied those factors and found that a private right of action may be implied under Title IX of the Education Amendments of 1972. *Fuzie* applied those same factors and held, as I do today, that a private right of action may not be implied under Title XIX of the Social Security Act.

ute, I remain unpersuaded that Congress intended to create a private right of action for money damages under the Act against a private provider of services. Accordingly, because it is inappropriate for the judiciary to create such a remedy absent either an explicit or implicit mandate from Congress,[8] I hold that there is no private right of action under Title XIX of the Social Security Act and therefore Counts I, II, III and IV of plaintiffs' complaint must be dismissed.

### Health Care Facilities Act

■ In counts I, II, III and IV of their complaint, plaintiffs also seek compensatory and punitive damages for defendant's alleged violations of the Pennsylvania Health Care Facilities Act and the regulations promulgated thereunder, 28 Pa.Code § 201.29, § 201–31.[9] In order for plaintiffs to maintain their claims under this statute, I must first find that a private right of action exists under the statute.

After a careful examination of the Health Care Facilities Act and its legislative history, I find that the statute does not vest either health care patients or their families with a private right of action. The Pennsylvania Health Care Facilities Act was enacted "to foster responsible private operation and ownership of health care facilities, to encourage innovation and continuous development of improved methods of health care and to aid efficient and effective planning using local health care systems agencies." Commonwealth of Pennsylvania, Laws of the General Assembly at 130, 132 (1979). To these ends, the legislature sought to create a comprehensive administrative scheme whereby all enforce-

ment was to be conducted by the Department of Health. Section 201 of the Act, entitled "Powers and Duties of the Department," provide, in pertinent part:

> The Department of Health shall have the power and its duties shall be:
>
> (2) To exercise *exclusive jurisdiction over health care providers*, and jurisdiction over health maintenance organizations in accordance with the provisions of this act.
>
> . . . .
>
> (15) *To enforce the rules and regulations* promulgated by the department as provided in this act.

35 Pa.Stat.Ann. § 448.201(2), (15) (Purdon Supp.1989) (emphasis added).

Moreover, Section 817 of the Act entitled "Actions against violations of law, rules and regulations," provides:

> Whenever any person, regardless of whether such person is a licensee, has willfully violated any of the provisions of this act or the rules and regulations pursuant thereto, *the department [of health] may maintain an action in the name of the Commonwealth* for an injunction or other process restraining or prohibiting such person from engaging in such activity.

*Id.* § 448.817(a) (emphasis added).

The language and legislative history of the Act are clear and unambiguous on their face and reveal an intent to create extensive administrative procedures whereby the Department of Health was to implement, supervise and enforce all aspects of the statute and its regulations. The Department of Health was expressly directed to "promulgate, after consultation with the

---

**8.** Having found that Congress did not explicitly or implicitly create a private remedy under the statute, I need not go further. As the Supreme Court has stated:

> It is true that in *Cort v. Ash,* the Court set forth four factors that it considered "relevant" in determining whether a private remedy is implicit in a statute not expressly providing one. But the Court did not decide that each of these factors is entitled to equal weight. The central inquiry remains whether Congress intended to create, either expressly or by implication, a private cause of action.

*Touche Ross & Co. v. Redington,* 442 U.S. 560, 575, 99 S.Ct. 2479, 2489, 61 L.Ed.2d 82 (1979). Because I find that no such intent exists in the legislative history of Title XIX, I need not reach the fourth part of the *Cort* analysis.

**9.** Plaintiffs' complaint cites § 201.34 and § 201–30(a) as the applicable regulations providing patients with reasonable notice of a facilities' intent to discharge and to perform adequate discharge planning. Since plaintiffs commenced this action, these regulations have been amended and repaginated as 28 Pa.Code § 201.29 and § 201.31 respectively.

policy board, the rules and regulations necessary to carry out the purposes of [the Act] and ... [t]o assure that [its] provisions ... and all rules and regulations promulgated under [the Act] are enforced." *Id.* § 448.803(1), (2). There is simply no evidence that the Pennsylvania legislature contemplated judicial enforcement of this statute or the regulations promulgated thereunder. On the contrary, the comprehensive administrative plan indicates that the legislature intended to have all violations of the statute enforced by the Department of Health. As a result, because plaintiffs fail to state a claim under the Health Care Facilities Act and its regulations, I will dismiss plaintiffs' claims brought under this statute.[10]

### Intentional Infliction of Emotional Distress

Plaintiffs Arlene Chalfin, Harry Chalfin, Richard Chalfin, Alan Chalfin and Susan Chalfin–Dughi all seek compensatory and punitive damages for the tort of intentional or reckless infliction of emotional distress, alleging that defendant's refusal to allow Mrs. Chalfin to return to Rosemont was "in bad faith, outrageous and utterly intolerable in a civilized society."[11]

■ Much ambiguity and debate has existed over whether Pennsylvania recognizes the tort of intentional infliction of emotional distress. *See Schachter v. Moss*

*Rehabilitation Hospital,* 695 F.Supp. 186, 187–88 (E.D.Pa.1988). The Third Circuit, however, has recently resolved the issue, holding that although Pennsylvania has been critical of the Restatement formulation of the tort,[12] a cause of action for intentional infliction of emotional distress nevertheless continues to exist in Pennsylvania. *See Williams v. Guzzardi,* 875 F.2d 46, 50–52 (3d Cir.1989). Thus, recognizing that this tort indeed exists in Pennsylvania, I turn to the question of whether plaintiffs have stated a claim sufficient to survive defendant's motion to dismiss.

Historically, Pennsylvania limited recovery for the tort of intentional infliction of emotional distress and "uniformly applied the 'impact rule,' which barred recovery for fright, nervous shock or mental or emotional distress unless it was accompanied by a physical injury or impact upon the complaining party." *Kazatsky v. King David Memorial Park, Inc.,* 515 Pa. 183, 191, 527 A.2d 988, 992 (1987). A limited exception to the impact rule was recognized in 1970 by the Pennsylvania Supreme Court. In *Niederman v. Brodsky,* 436 Pa. 401, 261 A.2d 84 (1970), Pennsylvania "abandoned the requirement of physical impact as a precondition to recovery only where the plaintiff was in personal danger of physical impact from the negligent force and actually feared physical impact. This became

---

**10.** In their papers opposing defendant's motion, plaintiffs allege an action for negligence per se under both Title XIX of the Social Security Act and the Health Care Facilities Act. Defendant contends that plaintiffs have raised this claim for the first time in their responsive memoranda opposing defendant's motion to dismiss. I note that while it is not clear that plaintiffs actually allege such a claim in their complaint, having dismissed counts I, II, III and IV, I need not reach that question.

**11.** I note that although count V of the complaint is brought by *all* the plaintiffs, the defendant seeks to dismiss this claim *only* with respect to Harry Chalfin, Richard Chalfin, Alan Chalfin and Susan Chalfin–Dughi.

**12.** Section 46 of the Restatement (Second) of Torts (1965) states:

(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe

emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

(2) Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress.

 (a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or

 (b) to any other person who is present at the time, if such distress results in bodily harm.

Although Pennsylvania recognizes a cause of action for intentional infliction of emotional distress, it has never actually adopted the Restatement version of the tort, *see Williams v. Guzzardi,* 875 F.2d 46, 50–52 (3d Cir.1989), and "[r]ecovery under section 46 is, as a matter of current jurisprudence ... 'highly circumscribed.'" *Schachter v. Moss Rehabilitation Hospital,* 695 F.Supp. 186, 189 (E.D.Pa.1988).

known as the 'zone of danger' theory." *Kazatsky*, 515 Pa. at 192, 527 A.2d at 992.

The zone of danger theory was subsequently extended to allow recovery by a plaintiff who, while outside the zone of danger, actually witnessed an event causing serious injury to a close relative. *See Sinn v. Burd*, 486 Pa. 146, 404 A.2d 672 (1979). Then, in *Mazzagatti v. Everingham*, 512 Pa. 266, 516 A.2d 672 (1986), the Pennsylvania Supreme Court considered the issue of whether a close relative who does not actually observe an accident, but rather "arrives at the scene of the accident and observes the victim a few minutes afterwards," 512 Pa. at 269, 516 A.2d at 673, is entitled to relief. Refusing to extend further the zone of danger doctrine, the court found that prior knowledge of the injury "serves as a buffer against the full impact of observing the accident scene." 512 Pa. at 279, 516 A.2d at 679. Thus, *Mazzagatti* made clear that "the critical element for establishing such liability is the contemporaneous observance of the injury to the close relative." *Id.*

■ Plaintiffs may state a cause of action for emotional distress "only if they can demonstrate that [they were] within the 'zone of danger' of defendants' conduct or if the circumstances of [their] injuries fall within a recognized exception to the 'zone of danger' requirement." *Schachter v. Moss Rehabilitation Hospital*, 695 F.Supp. 186, 189 (E.D.Pa.1988).[13] Further, because an individual who learns of such injury from a third person falls outside the parameters of the zone of danger requirement, it is clear that such a party may not maintain a claim for the tort of intentional infliction of emotional distress. *See Mazzagatti*, 512 Pa. at 279–80, 516 A.2d at 679. *See also Williams v. Guzzardi*, 875 F.2d at 51 n. 9 (3d Cir.1989).

■ There is no allegation in the complaint itself that either Harry Chalfin, Rich-

ard Chalfin, Alan Chalfin, or Susan Chalfin–Dughi actually witnessed the transfer of Mrs. Chalfin to Bryn Mawr hospital. Moreover, it appears from the language used by plaintiffs in both their complaint and their memorandum of law opposing defendant's motion, that Mrs. Chalfin's husband was "advised" of the transfer. I do not believe that the defendant advising Mrs. Chalfin's family either that she was transferred or that it would not readmit her to Rosemont is sufficient to place plaintiffs within the zone of danger and thus allow them to maintain an action for intentional infliction of emotional distress. As in *Mazzagatti*, here the plaintiffs had no "contemporaneous sensory perception of the injury," 512 Pa. at 280, 516 A.2d at 679, and as a result, "the emotional distress results more from the particular emotional makeup of the plaintiff[s] rather than from the nature of defendant's actions." *Id.*

After a careful review of the pleadings, I find that because Mrs. Chalfin's family cannot demonstrate either that they were within the zone of danger of defendant's conduct, or that they fall within a recognized exception to the zone of danger requirement, and because her family learned of her transfer from a third party, regardless of how liberally the pleadings are construed, these plaintiffs have failed to state a claim under Pennsylvania law for intentional infliction of emotional distress. Accordingly, pursuant to Federal Rule of Civil Procedure 12(b)(6), I will dismiss count V of the complaint with respect to plaintiffs Harry Chalfin, Richard Chalfin, Alan Chalfin and Susan Chalfin–Dughi.[14]

### *Punitive Damages*

■ Under Pennsylvania law, a plaintiff may only recover an award of punitive damages if she can show intentional tor-

---

**13.** The Pennsylvania Supreme Court has recognized only one exception to the "zone of danger" requirement, allowing recovery by a parent who has witnessed the violent death of his or her offspring. *See Kazatsky v. King David Memorial Park*, 515 Pa. 183, 193–94, 527 A.2d 988, 993

(1987) (citing with approval *Sinn v. Burd*, 486 Pa. 146, 404 A.2d 672 (1979)).

**14.** Mrs. Arlene Chalfin continues to maintain her cause of action under count V of the complaint for intentional infliction of emotional distress.

tious conduct on the part of a defendant.[15] *See Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265, 1277 (3d Cir.1979) (applying Pennsylvania law). The predicate inquiry is "whether there has been sufficiently aggravated conduct contrary to the plaintiffs' interests, involving bad motive or reckless indifference, to justify the special sanction of punitive damages. That sanction serves the dual function of penalizing past conduct constituting an aggravated violation of another's interests, and of deterring such behavior in the future." *Medvecz v. Choi,* 569 F.2d 1221, 1227 (3d Cir.1977).

■ Defendant argues that all claims for punitive damages must be dismissed because defendant's conduct may not, as a matter of law, be considered extreme or outrageous. I disagree. At this stage of the litigation, I cannot properly find that Mrs. Chalfin can prove no set of facts which would give rise to an award of punitive damages. For purposes of a motion to dismiss, I must of course accept as true all of plaintiff's well pleaded allegations, *Jenkins v. McKeithen,* 395 U.S. 411, 421–22, 89 S.Ct. 1843, 1848–49, 23 L.Ed.2d 404 (1969); *Labov v. Lalley,* 809 F.2d 220 (3d Cir.1987), and construe them in a light most favorable to her. *Scheuer v. Rhodes,* 416 U.S. 232, 237, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). While it is true that Mrs. Chalfin "must meet an extremely high burden of proof to establish entitlement to punitive damages," *David v. Pueblo Supermarket of St. Thomas,* 740 F.2d 230, 237 (3d Cir.1984), whether Mrs. Chalfin is ultimately able to meet that burden is not for the court to decide in the context of a motion to dismiss. Construing plaintiff's

well pleaded allegations in a light most favorable to her, I cannot, as a matter of law, find that Mrs. Chalfin will not be able to demonstrate "outrageous conduct" on the part of the defendant, and therefore will not dismiss her claim for punitive damages at this time.[16]

### Pennsylvania Unfair Trade Practices and Consumer Protection Law

Count VII of plaintiffs' complaint alleges that defendant violated Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Pa.Stat.Ann. §§ 201–1 to 201–9.2 (Purdon Supp.1989). While it is not clear from the face of the complaint whether all the plaintiffs are seeking relief for the alleged violations of this statute, I will assume for purposes of this analysis that count VII is alleged collectively and will proceed to discuss whether both Mrs. Chalfin and her family state a cause of action under the statute. For the reasons set forth below, I will grant defendant's motion to dismiss count VII with respect to Harry Chalfin, Richard Chalfin, Alan Chalfin and Susan Chalfin–Dughi and deny the motion as to Mrs. Chalfin.

The Pennsylvania Unfair Trade Practices and Consumer Protection Law was enacted by the Pennsylvania legislature "to benefit the public at large by eradicating, among other things, 'unfair or deceptive' business practices.... [with] the statute's underlying foundation [being] fraud prevention." *Commonwealth v. Monumental Properties, Inc.,* 459 Pa. 450, 457–59, 329 A.2d 812, 815–16 (1974). To this end, Section 3 of the Act provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or

---

15. Plaintiffs seek punitive damages in counts I, II, III, IV and V of their complaint. Because I have dismissed counts I, II, III and IV of the complaint, and have dismissed count V of the complaint as to plaintiffs Harry Chalfin, Richard Chalfin, Alan Chalfin and Susan Chalfin–Dughi, I consider only whether Mrs. Chalfin herself may be entitled to punitive damages under count V of the complaint.

16. "Punitive damages are appropriate to punish and deter only extreme behavior and, even in

the rare instances in which they are justified, are subject to strict judicial controls." *Martin v. Johns–Manville Corp.,* 508 Pa. 154, 169, 494 A.2d 1088, 1096 (1985). I of course make no judgment at this time as to whether Mrs. Chalfin will be able to produce sufficient evidence, supported by competent medical evidence of causation and severity, to show intentional and outrageous conduct, thereby allowing her to ultimately prevail on her claim for punitive damages.

commerce ... are hereby declared unlawful." *Id.* § 201–3.

Section 201–9.2 of the Act provides an express private right of action to individuals who have suffered a pecuniary loss as a result of a violation of the Act:

> Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act, may bring a private action, to recover actual damages or one hundred dollars ($100), whichever is greater. The court may, in its discretion, award up to three times the actual damages sustained, but not less than one hundred dollars ($100), and may provide such additional relief as it deems necessary or proper.

*Id.* § 201–9.2(a).

Defendant contends that although the statute does in fact provide a private right of action, the Act clearly was not intended to encompass a situation such as the one at bar. Because it is clear that plaintiffs may only maintain their claim if they can show that the parties involved and the actions complained of fall within the parameters of the Act, I must determine the following: (1) whether defendant is a "person" within the meaning of the Act; (2) whether the health care services provided by defendant's facility constitute "trade" or "commerce" contemplated by the Act; (3) whether the defendant's acts, as alleged by the plaintiffs in their complaint and taken as true, properly constitute "unfair or deceptive acts or practices" as those terms are defined by the Act; and (4) whether both Mrs. Chalfin and her family may recover for the defendant's alleged violative conduct.

■ First, the Act defines "person" as "natural persons, corporations, trusts, part-nerships, incorporated or unincorporated associations, and any other legal entities." *Id.* § 201–2(2). Thus, it is clear that defendant, a corporation, falls within the statute's definition of the term "person."

■ Second, I turn to whether the health care Rosemont provides falls within the ambit of the statute's definition of "trade or commerce." The Act defines "trade" or "commerce" as "the advertising, offering for sale, sale or distribution of *any services* and any property, tangible or intangible, real personal or mixed, and any other article, commodity, or thing of value wherever situate, and includes *any trade or commerce directly or indirectly affecting the people of this Commonwealth.*" *Id.* § 201–2(3) (emphasis added). Mindful that "[t]his already broad language is to be construed broadly so as to effectuate as fully as possible the Legislature's purpose of preventing unfair or deceptive practices," *Culbreth v. Lawrence J. Miller, Inc.*, 328 Pa.Super. 374, 382, 477 A.2d 491, 495 (1984), I find that the health care the Rosemont facility provides indeed falls within the scope of the "trade or commerce" clause of the Act.

Defendant argues that the type of services provided to Mrs. Chalfin by Rosemont should not be construed as falling within the Act's meaning of "goods or services primarily for personal, family or household purposes." I disagree. It is clear that the legislature intended to give the Consumer Protection Act the broadest scope possible. *See* 328 Pa.Super. at 382, 477 A.2d at 495. To facilitate this, the legislature specifically utilized broad terms, merely restricting the scope of the Act to goods and services purchased for "personal, family or household services." [17] Clearly, Mrs. Chalfin purchased health care "services" from the defendant, and did so for her own personal benefit. It is uncontroverted that the legislature's paramount goal was to provide a

---

**17.** It is clear that the Act's main purpose in using the phrase "personal, family or household services," was to restrict the Act's scope to consumer rather than commercial transactions. *See Waldo v. North American Van Lines, Inc.*, 669 F.Supp. 722, 725–26 (W.D.Pa.1987) (pur-chases for primarily business, rather than "personal family or household purpose[s]" stand outside the reach of the Consumer Protection Law). *See also American Standard Life & Accident Ins. Co. v. U.R.L., Inc.*, 701 F.Supp. 527, 538 (M.D.Pa.1988) (same).

remedy for those individuals who are the victims of fraudulent conduct. Certainly, such protection is no less compelling in the context of a provider of health care services to the elderly and infirm than to a consumer who, in reliance upon a salesperson's misrepresentation, purchases a defective product in a traditional sales transaction.[18] To find otherwise would allow unscrupulous institutions the upper hand, leaving individuals like Mrs. Chalfin vulnerable to fraudulent practices, a burden the legislature clearly did not intend to place on the consumer. Accordingly, I find that the health care services provided by the Rosemont facility provided a "personal" benefit to Mrs. Chalfin, as that term is used in Section 201–9.2, and thus falls within the broad scope of the Act.

▮ Next, I must determine whether the unfair or deceptive acts plaintiffs allege in their complaint state a claim under the statute. Plaintiffs contend that at the time Mrs. Chalfin was admitted to Rosemont, Mrs. Chalfin entered into an "Admission Agreement" with the facility which represented the following:

> Where other sources of payment may be available, such as State or Federal agencies (under Medicare, Medicaid, or other programs) or insurance companies, Facility will aid patient in determining whether Patient's care may be so covered and, if appropriate, will submit a claim to the proper agency or insurance company for payment.

Plaintiffs' Complaint at ¶ 46. Plaintiffs allege that defendant refused to aid Mrs. Chalfin in processing her application for Medicaid, and in fact, had never intended to assist her in this task, hoping instead to obtain a private patient who would pay a higher rate to the facility than Mrs. Chalfin would under medical assistance. As a result, plaintiffs contend that the "[d]efendant's practice of discharging patients that apply for Medical Assistance in violation of an express agreement is an unfair or deceptive act or practice" which squarely falls within the meaning of the Act, and therefore violates the statute. *See id.* at ¶ 49.

Section 201–2 of the Consumer Protection Law identifies sixteen specific examples of "unfair methods of competition" and "unfair or deceptive acts or practices," as well as providing a general catch-all provision making "any other fraudulent conduct which creates a likelihood of confusion or misunderstanding" an unfair or deceptive act or practice under the statute. Plaintiffs focus their argument on the general catch-all provision of this section,[19] alleging that the defendant engaged in fraudulent conduct which created a likelihood of confusion or misunderstanding when it expressly represented that it would assist its patients in applying for medical assistance when this was in fact not its practice. Accepting Mrs. Chalfin's allegations as true, as I must for purposes of this motion, I find that if in fact the defendant never intended, as the agreement provided,

18. Although the Pennsylvania courts have not specifically addressed the issue of whether a provider of health care services falls within the scope of the Unfair Trade Practices and Consumer Protection Law, courts have read the statute liberally, allowing recovery in a wide range of consumer transactions. *See, e.g., Commonwealth v. Monumental Properties, Inc.,* 459 Pa. 450, 467, 329 A.2d 812, 827 (1974) (leasing residential property falls within ambit of Consumer Protection Law); *Pekular v. Eich,* 355 Pa.Super. 276, 285–90, 513 A.2d 427, 432–34 (1986) (insured may seek compensation against insurer under Consumer Protection Law), *appeal denied,* 516 Pa. 635, 533 A.2d 93 (1987); *Culbreth v. Lawrence J. Miller, Inc.,* 328 Pa.Super. 374, 382, 477 A.2d 491, 496 (1984) (business of public adjuster within Consumer Protection Law's definition of "trade" or "commerce").

19. It is clear that this catch-all provision is not intended to be confined or limited in any way to the sixteen specific examples of unfair conduct enumerated in Section 201–2 of the Act. As the Pennsylvania Supreme Court has expressly stated:

> To hold that the general antifraud provision ... is bound by the specifically-enumerated examples of unfair conduct would plainly thwart the legislative intent. Such a holding would negative the Legislatures's understanding that "Fraud is infinite" and would allow the broad prohibition of section 3 to be "eluded by new schemes which the fertility of man's invention would contrive." This we will not do.

*Monumental Properties,* 459 Pa. at 480, 329 A.2d at 827 (citations omitted).

to assist its patients in securing medical assistance and instead intended to replace those patients who sought Medicaid with private care patients, this would constitute fraudulent conduct likely to create confusion or misunderstanding, thus violating Section 201–2(4)(xvii) of the Act.[20]

■■■ However, while I find that Mrs. Chalfin has stated a claim under the Act, it is clear that Mrs. Chalfin's family has not. The health care services Rosemont provided were directed specifically to Mrs. Chalfin. While her family may have in fact derived some benefit from Mrs. Chalfin's stay at the facility, it was Mrs. Chalfin herself who purchased health care services from the defendant. Moreover, the alleged fraudulent misconduct was directly perpetrated, if at all, on the patient herself and not her family. Because both the services the facility provided and the alleged misrepresentation were directed specifically at Mrs. Chalfin herself, there is nothing in either the statute itself, its legislative history or the case law which provides support for the Chalfin family's claim against the defendant under this statute.

■■■ Finally, I consider the question of whether defendant Beverly Enterprises should be excluded from the dictates of the Act. Clearly, the Act does not specifically identify health care providers as a class which explicitly falls within the parameters of the Act. The legislature, however, when it deemed necessary, chose to expressly exclude certain classes from the scope of the statute. For example, the Act provides an express exclusion for "any owner, agent or employee of any radio or television station, or ... any owner, publisher, printer, agent or employee of a newspaper or other publication, periodical or circular, who, in good faith and without knowledge of the falsity or deceptive character thereof, publishes, causes to be published or takes part in the publication of such advertising." 73 Pa.Stat.Ann. § 201–3. Defendant, however, is not one of the class which has expressly been excluded from the statute. The Pennsylvania courts have consistently taken the view that unless the legislature expressly excludes a certain group from the confines of the Consumer Protection Law, no such exclusion exists: "There is no indication of an intent to exclude a class or classes of transactions from the ambit of the Consumer Protection Law. When the Legislature deemed it necessary to make an exception from the Law's scope, it did so in clear language." *Monumental Properties,* 459 Pa. at 457–58 n. 5, 329 A.2d at 815 n. 5. *See also Culbreth,* 328 Pa.Super. at 383, 477 A.2d at 496 ("[T]he Consumer Protection Law provides no express exclusion from its provisions for public adjusters or public adjuster contracts. Accordingly, there is no exclusion.") Because it is clear that the legislature did not specifically seek to exclude health care providers from the boundaries of the statute, I find that no such exclusion exists and will therefore deny the motion of the defendant to dismiss count VII of the complaint with respect to Mrs. Chalfin. Having found, however, that Mrs. Chalfin's family does not state a claim under the statute, I will grant defendant's motion and dismiss count VII of the complaint as to Harry Chalfin, Richard Chalfin, Alan Chalfin and Susan Chalfin–Dughi.

### *Plaintiff's Cross Motion for Partial Summary Judgment*

Plaintiffs have filed a motion for summary judgment as to their contract claim. For the following reasons, that motion will be denied at this time.

■■■ Under the Federal Rules of Civil Procedure, summary judgment may be granted when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). For a dispute to be "genuine," the evidence must be such that a reasonable jury could return a verdict for

---

**20.** I note that while this allegation may be difficult to prove at trial, it is well settled that "difficulty of proof provides no reason for dismissing the complaint." *Adato v. Kagan,* 599 F.2d 1111, 1117 (2d Cir.1979) (quoting *Harmsen v. Smith,* 542 F.2d 496, 502 (9th Cir.1976)). At this juncture, I need only determine whether plaintiffs' claim, if true, states a claim under the Pennsylvania Unfair Trade Practices and Consumer Protection Law.

the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). To establish a genuine issue of material fact, the non-moving party must introduce evidence beyond the mere pleadings to create an issue of material fact on "an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The evidence presented must be considered in a light most favorable to the non-moving party, *Baker v. Lukens Steel Co.,* 793 F.2d 509, 511 (3d Cir.1986), and that party must receive the benefit of all reasonable inferences arising from that evidence. *Gans v. Mundy,* 762 F.2d 338, 341 (3d Cir.), *cert. denied,* 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985).

 Although the plaintiffs assert that the contract it entered into with the defendant did not provide "for any other contingencies or conditions for earlier termination," upon review of plaintiffs' motion, the contract, defendant's opposition thereto and its supporting papers, I find that I am unable to grant the plaintiffs' motion. Despite plaintiffs' assertions, there is no evidence in the record that the admission agreement was the sole agreement between the parties. In fact, the contract in question, entitled "Admission Agreement" refers to and includes by reference a document defendant refers to as "rules and regulations governing the patient's conduct and responsibilities while in the Facility." (actually entitled "Patient and Employee Rights," Pa.Code § 201.29). Item (h) of that document provides, in pertinent part:

> The patient shall be transferred or discharged only for medical reasons or for his welfare or that of other patients or for nonpayment for his stay. The patient is given reasonable notice to insure orderly transfer and discharge. Such actions are documented in the medical records of the patient.

Because I believe that the question of whether there was a legitimate medical reason for the Mrs. Chalfin's transfer from the defendant's facility and, if there was,

whether sufficient reasonable advance notice was given to her, are genuine issues of material fact, I will deny plaintiffs' motion for partial summary judgment on their contract claim.

*Conclusion*

In sum, I have dismissed counts I, II, III and IV of the complaint as to all the plaintiffs because no private right of action exists under either Title XIX of the Social Security Act or the Pennsylvania Health Care Facilities Act, and have dismissed counts V and VII as to Harry Chalfin, Richard Chalfin, Alan Chalfin and Susan Chalfin–Dughi for failure to state a claim upon which relief can be granted. Mrs. Arlene Chalfin maintains her claim for intentional infliction of emotional distress in count V and her claim under the Pennsylvania Unfair Trade Practices and Consumer Protection Law in count VII as do all plaintiffs for their count VI breach of contract claim.

An appropriate order follows.

### ORDER

AND NOW, this 26th day of June, 1989, upon consideration of the motion of the defendant Beverly Enterprises to dismiss counts I, II, III, IV, and VII of the complaint as to all the plaintiffs, and to dismiss count V with respect to Harry Chalfin, Richard Chalfin, Alan Chalfin and Susan Chalfin–Dughi, and the cross motion of the plaintiffs for summary judgment on their contract claim (count VI), for the reasons set forth in the accompanying memorandum, it is hereby ORDERED and DECREED that:

1. the motion of the defendant to dismiss counts I, II, III and IV is GRANTED;

2. the motion of the defendant to dismiss count V as to Harry Chalfin, Richard Chalfin, Alan Chalfin and Susan Chalfin–Dughi is GRANTED;

3. the motion of the defendant to dismiss count VII is GRANTED as to plaintiffs Harry Chalfin, Richard Chalfin, Alan Chalfin and Susan Chalfin–Dughi, and DENIED as to Mrs. Arlene Chalfin;

4. plaintiffs' cross motion for summary judgment on their contract claim (count VI) is DENIED.